**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**DARLING & COMPANY, Respondent.**

**No. 17394.**

United States Court of Appeals Seventh Circuit.

Jan. 6, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Robert A. Giannasi, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, and Madge F. Jefferson, Attys., N. L. R. B., Washington, D. C., for petitioner.

J. Ternell Vaughan, Fred Leicht, Jr., Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for respondent.

Before KNOCH, Senior Circuit Judge, and FAIRCHILD and KERNER, Circuit Judges.

KNOCH, Senior Circuit Judge.

This matter is before us on application of the National Labor Relations Board filed pursuant to § 10(e) of the National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq., § 160(e), for enforcement of its Order of April 4, 1968, reported at 170 NLRB No. 127, in which the Board directed the respondent, Darling & Company, to cease and desist from specific violations found and from interfering in any similar manner with the rights of its employees under § 7 [1] of the Act. The Board found that respondent violated § 8(a) (1), (3) & (4) [2] of the Act by withholding severance pay from one group of employees while granting it to another and further violated § 8(a) (1) by announcing its decision to do so. The Board directed respondent further to grant severance pay to the production employees on the same terms (with interest) as was awarded other employees on the payroll at the East St. Louis plant at the time that plant closed on March 31, 1967, with notices to be sent to the last known addresses of all the employees.

The difficulties between respondent and International Chemical Workers Union, AFL–CIO, Local No. 127, which represents the production employees, go back to 1965 when extended contract negotiations culminated in a lockout of the production employees on December 16, 1965. One of the production employees,

Lewis Lane, as an individual, filed an unfair labor practice charge with the Board on January 4, 1966, and on March 30, 1967, the Trial Examiner found that the lockout had been unlawful and recommended an order directing respondent to make whole all the employees from the first day of the lockout. Subsequently on May 23, 1968, the Board held otherwise that this lockout had been a legitimate economic weapon and did not constitute an unfair labor practice. Mr. Lane's petition to review that decision is pending before the Court of Appeals for the District of Columbia (#22,357) in which respondent has been allowed to intervene.

In the meantime, however, negotiations continued after the lockout and an agreement was reached February 15, 1966, which was to remain in force until December 1, 1967 and to be renewed from year to year in the absence of written notice.

In the proceedings before the Trial Examiner respecting the lockout, Roy L. Thompson, a representative of the Chemical Workers Union testified that as part of that agreement his Union undertook not to file charges because of the December 16, 1965 shutdown, but that the action of an individual member was beyond Union control.

The crane operators and maintenance electricians at respondent's East St.

1. [§ 7] Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8] (a) (3).

2. § 8(a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7] of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section [6], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:
      *     *     *     *     *
   (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

Louis plant were represented by the International Brotherhood of Electrical Workers, Local No. 309. The maintenance millwrights and carpenters were represented by the United Brotherhood of Carpenters and Jointers, Local No. 169.

Robert S. Rowe, Labor Relations Attorney for respondent, testified that on December 5, 1966, he notified representatives of all three unions that on failure of attempts then being made to sell the East St. Louis plant as a going concern the plant would be shut down. On or about February 14, 1967, he wrote the three unions that a complete shutdown of operations was contemplated on or about April 1, 1967. The Trial Examiner found that the plant was closed on March 31, 1967, concededly for purely economic reasons. He also found that respondent had made extensive efforts to find other employment for its employees.

On the morning of March 30, 1967, representatives of respondent met with representatives of the IBEW and Carpenters unions and agreed to grant severance pay to the employees they represented. The respondent stresses the fact that counsel for the Carpenters wrote requesting that meeting to bargain on specific proposals including severance pay, and that at the meeting with the Carpenters and IBEW together as had been the practice frequently in the past, it was tacitly understood that the aforesaid counsel was speaking for both unions.

In the afternoon at a meeting with the Chemical Workers, the Union President, Silas Watson, asked whether the respondent would give the production workers whom his Union represented similar severance pay. There was a conflict in the testimony as to the exact reply made by Mr. Rowe.

Mr. Rowe testified that he said the company had decided that it was not going to do so "at that time"; that the company wanted to defer the question on severance pay for the people in this bargaining unit until it ascertained what liability in connection with the unfair labor practice hearing would result (estimates ran as high as $50,000) and the company felt it wanted to know just what the economic situation was before it came to a decision on a severance pay arrangement. [The decision of the Trial Examiner, as it happened, issued the following day after the meeting with the Chemical Workers Union.] He also testified that he indicated if it developed there was no back pay liability, he felt that the company would treat the production employees on the same basis as those in the other two bargaining units; that the decision on severance pay at that time was not his to make. He denied ever saying that if the company were found liable for back pay, it would not give severance pay. Mr. Watson testified that Mr. Rowe had said that if the company did not "win" the case, it would not give severance pay. The Trial Examiner credited Mr. Rowe's evidence as to the content of his statement.

The respondent contrasts the facts respecting the other two unions with the absence of any written or oral request from the Chemical Workers specifically to bargain over severance pay prior or subsequent to the meeting with Mr. Rowe. However, there was testimony by Mr. Thompson of the Chemical Workers respecting an exchange of telephone calls with respondent's Plant Manager, Lee Stahlman, to set up a meeting to discuss the plant closing and related matters. Mr. Stahlman did not appear as a witness. The Trial Examiner found Mr. Thompon's evidence credible. As indicated such a meeting was held on March 30, 1967 and the issue of severance pay was raised.

No severance pay has been given to the production employees. Such pay has been given to most of the employees represented by the other two unions.

■ The action of the respondent thus penalized employees represented by the one union involved in the pending Board proceedings on the lockout. Regardless of the asserted lack of intent to do so, respondent's actions must have discour-

aged affiliation with the Chemical Workers. Radio Officers' Union v. National Labor Relations Board, 1954, 347 U.S. 17, 45 et seq., 74 S.Ct. 323, 98 L.Ed. 455. Respondent would distinguish this case and similar cases on the ground that they deal with inherently discriminatory practices which require no specific evidence of an employer's motive to discourage union membership on the ground that one is presumed to intend the foreseeable consequences of his conduct. We do not agree that the facts of this case take it out of the scope of Radio Officers. Nor do we agree that this case is distinguished from NLRB v. Great Dane Trailers, Inc., 1967, 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027, on which the Trial Examiner relied because the vacation benefits there given to non-strikers and denied strikers accrued under a collective bargaining contract in a strike climate.

■ The respondent sees no possible threat in the announcement of a mere postponement in consideration of the issue, especially as the Union was powerless to withdraw the charge had it so desired. The respondent must have foreseen that its action would inhibit filing charges and testifying in support of them. Section 8(a) (4) has long been construed as designed to prevent "the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses." John Hancock Mutual Life Insurance Company v. NLRB, 1951, 89 U.S.App. D.C. 261, 191 F.2d 483, 485.

It is respondent's view that had punishment of the Union been an objective a flat refusal even to consider severance pay would have been more logical. We believe such a course of action would have represented a difference in degree rather than in kind.

The respondent also contends that even if there was an inference of a threat it was far outweighed by the clear business justification for the delay. But, as the Board noted, only employees represented by the Union whose member had filed the charge were made to bear the economic burden of the possible adverse results of that charge.

We do not agree with the respondent that there is an inconsistency in the Trial Examiner's finding that Mr. Rowe did not use the words "win" or "lose" with reference to the outcome of the then pending Board case and then going on to conclude that his statements carried the intendment that if the respondent lost the pending case it would not grant severance pay to the production employees. The Trial Examiner said that Mr. Rowe was experienced in labor-management negotiations and it was most unlikely he would use the words "win" or "lose" in this discussion but that his admitted statements were sufficiently plain.

The respondent is still doing business at its other plants and to limit the negative "desist" aspects of the Order, as respondent asks, to the closed East St. Louis plant would render those aspects of the Order a nullity.

■ We do not read the Order as directing severance pay "in the same amounts" as respondent complains, pointing out that the vacation benefits which figured in the computations are not identical for all three unions, for example. The Order says "on the same terms and in the same amounts" as the other employees which merely calls for computation on the same non-discriminatory basis. Problems arising in such computation may be resolved in the compliance stage. The possibility of such problems does not justify denial of enforcement of the Board's Order. NLRB v. Acme Mattress Co., 7 Cir., 1951, 192 F.2d 524, 528. The Order of the Board will be

Enforced.