CARPENTER SPRINKLER
CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 807, Docket 78–4189.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1979.
Decided Aug. 17, 1979.

Edward E. Shumaker, III, Concord, N. H. (Gallagher, Callahan & Gartrell, Concord, N. H., Christopher C. Gallagher, Concord, N. H., of counsel), for petitioner.

Mary K. Schuette, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Janet C. McCaa, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent.

Before SMITH, OAKES and VAN GRAAFEILAND, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is a petition to review a decision of the National Labor Relations Board finding Carpenter Sprinkler Company, a Vermont employer, in violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and ordering remedial action. The Board cross-petitions for enforcement of its order. While we uphold the finding of violation of the Act, we deny enforcement in full of the order, and grant enforcement in part.

Carpenter Sprinkler Corporation ("Carpenter" or "employer") is an installer of automatic sprinkler systems, located in Colchester, Vermont. For approximately twenty years, it has had a bargaining relationship with Local 669 of the Road Sprinkler Fitters Union, associated with the United Association of Journeymen and Apprentices, in the Plumbing and Pipefitting Industry of the United States and Canada ("Union"). The Union represented nineteen employees of Carpenter.

For some time, Carpenter was a member of a multi-employer bargaining unit, the National Automatic Sprinkler and Fire Control Association. This association conducted bargaining with the International Union in Washington, D. C. Carpenter did not take part in the negotiations individually. In early 1977, Carpenter withdrew from the multi-employer bargaining unit. This withdrawal was caused by Carpenter's belief that the wage and benefit rates of the national agreement were too high, and were causing economic losses to the company. Carpenter felt that the particular economic conditions of Vermont could be better reflected in an independently negotiated contract. The national agreement terminated as of March 31, 1977.

On February 16, 1977, the employer and the Union met to begin negotiations on a new collective bargaining agreement. Most of this three-and-one-half hour session was spent in general discussions of the economically depressed conditions in the Vermont area. The employer made known that it felt it could not afford the higher rates which the Union wanted, in line with the national agreement. Neither the Union nor the employer presented any specific proposals at this first meeting, and no agreement was reached.

The next bargaining session was held on April 8, 1977. The Union representative read proposals from an outline. Some of these proposals called for rates which were even higher than those in a tentative agreement reached between the Union and the multi-employer association. On comparing the new proposals with those in the national, multi-employer agreement, the Carpenter representatives "expressed dismay," and stated that they "could not live" with the higher rates proposed by the Union. The company did not present any proposals of its own, and again, no agreement was reached.

Several hours after the meeting ended on April 8, Wes Wilder, the Union representative, called Carpenter President Wayne LaFayette to get a response to the contract proposals which the Union had made at the

meeting. LaFayette told Wilder that both the Union proposals and the terms of the national multi-employer agreement were financially unacceptable to Carpenter. Wilder then said that as far as he was concerned the parties were at an "impasse," and that the Union would call a strike. Wilder called back soon thereafter and told LaFayette that he wanted to clarify that he did not have the authority to call a strike, although it was his personal view that the negotiations were at an impasse. This telephone conversation was tape recorded by LaFayette, without Wilder's knowledge.

On April 12, 1977, Union President Thomas Hanna sent a mailgram to Carpenter, noting his reports from Wilder that the bargaining between the company and the Union had been unsuccessful. He also told Carpenter that Wilder would return to the area for further negotiations, and it was

> Local 669's intention to take such legal and economic action as it deems appropriate and justified if these negotiations with your firm are unsuccessful.

Carpenter sent a letter in response to the Union on April 13. The company confirmed its belief that the parties were at an impasse. The letter stated

> Since we are at an impasse and since the old contract has expired, we feel it necessary to put into effect a new schedule of wages and other benefits so that the employees will know where they stand.

A page of "Proposal Highlights" was attached to the letter. These proposals included various reductions in wages and benefits, including a reduction in wage rates for sprinkler fitters from $9.61 per hour to $7.50 per hour. The company noted that it intended to put the new schedule into effect on Monday, April 18, "and earnestly request that if you have any questions or comments concerning same that you contact us immediately." The next day, the company sent another letter indicating its intention to alter existing medical, pension and hospitalization benefits.

After discussions between the local representatives and the union officials in Washington, Union President Hanna ordered a strike. On April 18, all of the nineteen union employees went on strike. That same day, Carpenter implemented its changes in wages and benefits. Nine of the strikers returned to work in the next three months under the new terms.

After a complaint of unfair labor practice was filed by the Union, a hearing was held. Administrative Law Judge Zankel found that no impasse had actually existed, and so the employer had violated § 8(a)(1) and (5) by its unilateral changes in terms which amounted to a refusal to bargain in good faith. The Administrative Law Judge ("ALJ") ordered broad remedial action in the form of an order to bargain, reinstate striking workers with back pay, return wages, hours and other benefits to the *status quo ante* in existence prior to April 18, 1977, and make retroactive payments to the Union welfare and pension funds, at the Union's request. On review, the National Labor Relations Board upheld the finding of violation based on no impasse, and extended the remedy by ordering a return to the *status quo ante*, including back pay for all employees of the company, not just the strikers, but also the strike replacements hired.

## DISCUSSION

### A. *Impasse*

We are unable to say that the Board's finding that an impasse had not occurred is not "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) and (f). Thus, we uphold the finding of violation of § 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) and (5).

Unilateral action by an employer concerning subjects of mandatory bargaining is a violation of the duty to bargain in good faith, in the absence of a true impasse in negotiations. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *New York Printing Pressmen & Offset Workers v. NLRB*, 538 F.2d 496, 501 (2d Cir. 1976). Such unilateral action by an employer is disfavored because it detracts from the

legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless. *See NLRB v. General Electric Co.,* 418 F.2d 736, 748 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). Thus, even unilateral increases in wages and benefits are prohibited in the absence of an actual impasse. *Katz, supra; New York Printing Pressmen, supra.* And accordingly, there is no requirement that the unilateral actions have been made in subjective bad faith in order to establish a refusal to bargain under the Act. *Katz, supra,* 369 U.S. at 743, 747, 82 S.Ct. 1107.

To protect the integrity of the collective bargaining process, there is a strong requirement that a clear impasse in negotiations exist before any unilateral changes in the terms of employment be made. The finding of a violation of the Act in this case, then, turns on the issue of whether an impasse actually existed. As has been recognized, the issue of the existence of an impasse "is a question of fact peculiarly suited to the Board's expertise." *NLRB v. J. H. Bonck Co.,* 424 F.2d 634, 638 (5th Cir. 1970). The scope of this court's review of Board factual findings is "quite limited," and a Board finding that no impasse existed could only be overturned if the "substantial evidence" standard of § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f), were not met. *See NLRB v. Columbia University,* 541 F.2d 922, 928 (2d Cir. 1976). Since we are unable to say that the standard has not been met, we affirm the Board's holding that there was no actual impasse in this case.

The parties in this case had only met twice to attempt to reach a collective bargaining agreement before the "impasse" urged by Carpenter occurred. While there appears to have been a recognition by both sides that their respective positions were generally far apart, there was no continuous "give and take" in the form of negotiating over specific proposals. No specific proposals were made by either side at the first meeting, and no counterproposals were made by the employer in response to the Union's list of suggestions at the second meeting. While the two negotiating sessions were not marked by any indication of bad faith on the part of the employer, *compare General Electric, supra,* 418 F.2d at 756–63, the negotiations here were not sufficiently exhaustive to find that an impasse had already been reached. See generally *New York Printing Pressmen, supra,* 538 F.2d at 498 (21 negotiating sessions); *Alexander Typesetting, Inc.,* 207 NLRB 301, 302 (1973) (6 negotiating sessions at which "hard bargaining" took place); *Taft Broadcasting Co.,* 163 NLRB 475 (1967) (more than 23 bargaining sessions). Thus, it could not be concluded that "there was no realistic prospect that continuation of discussion at that time would have been fruitful." *NLRB v. Independent Association of Steel Fabricators, Inc.,* 582 F.2d 135, 147 (2d Cir. 1978), *citing American Federation of Television & Radio Artists v. NLRB,* 129 U.S. App.D.C. 399, 409, 395 F.2d 622, 628 (1968).

### B. Tape Recording

When Union representative Wilder called Carpenter President LaFayette following the second meeting on April 8, LaFayette switched on a conference telephone to receive the call, and another company officer, James Esden, tape recorded the call from Wilder. Wilder had no knowledge that the conversation was being taped, and LaFayette did not inform him so.

At the administrative hearing, Wilder testified that he never made the statement that the parties were at an "impasse." On cross-examination of Wilder by counsel for Carpenter, the tape recording of the phone conversation was offered as evidence to impeach Wilder's testimony on this fact. Wilder authenticated the recording as a fair representation of the conversation. After conducting a hearing on the nature of the evidence, Administrative Law Judge Zankel admitted the tape into evidence, ruling that the surreptitious nature of the tape did not affect its evidentiary value.

On review, the Board reversed the ALJ on this point, holding that secretly prepared

tapes are inadmissible in Board proceedings. The Board based its ruling on policy reasons, concluding that a rule allowing such secret tapes into evidence "would inhibit severely the willingness of parties to express themselves freely and would seriously impair the smooth functioning of the collective-bargaining process." *Carpenter Sprinkler Corp. v. Road Sprinkler Fitters Union Local 669*, 238 NLRB No. 139 (1978), slip op. at 5. Carpenter challenges this Board ruling, arguing that a tape such as this would most likely be admissible in accordance with the Federal Rules of Evidence. *Cf. Lopez v. United States*, 373 U.S. 427, 438–40, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (tape recording of bribe offer to agent was admissible against defendant); *United States v. Santillo*, 507 F.2d 629 (3d Cir.), *cert. denied*, 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975) (tape recording of conversation between defendant and government agent admissible).

Section 10(b) of National Labor Relations Act provides that any unfair labor practice proceeding before the Board

> shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States . . . . [29 U.S.C. § 160(b).]

We have recognized that it is up to the courts of appeals to review evidentiary rulings of the Board, and to determine the extent to which rules of Board proceedings must conform to the rules of the federal courts. *NLRB v. Stark*, 525 F.2d 422, 427 (2d Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976). However, the Board is not required to observe automatically all the rules of evidence governing the trial of cases in court. *NLRB v. W. B. Jones Lumber Co.*, 245 F.2d 388, 392 (9th Cir. 1957). Given the wide discretion entrusted by Congress to the Board in regard to internal affairs including such evidentiary decisions, *NLRB v. Tonkawa Refining Co.*, 452 F.2d 900, 903 (10th Cir. 1971), the Board was within its discretion in fashioning the rule in this case that surreptitiously prepared tape recordings are inadmissible as evidence.

Negotiations in the labor relations field are often a delicate matter. Courts must balance the interests of an employer against the possibility of coercing or intimidating employees in their exercise of rights under the Act, and harming the collective bargaining process. *Cf. Title Guarantee Co. v. NLRB*, 534 F.2d 484, 491 (2d Cir.), *cert. denied*, 429 U.S. 884, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976) (access to employee statements made in connection with Board investigation denied under the Freedom of Information Act). The ruling of the Board in this case specifically referred to the "significant problems" which might result from allowing tape recordings of contract negotiations into evidence. *Carpenter, supra*, 238 NLRB No. 139, slip op. at 6 n. 9. Given the need for this balancing, and the discretion afforded the Board in internal matters, the Board did not abuse its discretion in ruling that secretly recorded conversations were inadmissible in its proceedings.

## C. Remedy

Since we agree with the Board that a violation of the duty to bargain, 29 U.S.C. § 158(a)(1) and (5), occurred in the unilateral action by Carpenter, some remedial action is warranted. In light of the facts in this particular case, however, we feel that the Board's remedial order was too broad, and we grant only partial enforcement.

The ALJ issued an order requiring Carpenter to cease and desist from violations of the Act, specifically from taking unilateral action to change wages or other terms of employment or otherwise interfering with employees' section 7 rights. (29 U.S.C. § 157.) The employer was also ordered to take positive remedial action to bargain collectively with the Union, to reinstate the employees who had participated in the strike, and to award back pay to those employees who had returned to work during the strike. The ALJ also ordered Carpenter to return all wages and other terms of employment to the *status quo ante* in existence prior to the unilateral changes made April 18, 1977, including making ret-

roactive payments to the Union welfare and pension fund if the Union expressed a desire to restore the *status quo ante* in those areas.

The Board upheld and extended the broad remedy ordered by the ALJ, concluding that the restitution remedy should be provided for strike replacements as well as for returning striking employees. Thus, the Board held that both employees who had gone on strike in response to Carpenter's unilateral changes in terms of employment, and those had been hired as replacements for those strikers, should be reimbursed for the difference between wages and other benefits that they received and the economic benefits they would have received if the employer had not unilaterally altered wages and other conditions.

Carpenter takes strong exception to the remedy ordered by the Board. Carpenter claims that such an extensive remedy would have devastating economic consequences for the company, a small Vermont employer. While there is no evidence in the record as to the exact costs to the employer, Carpenter contends that the cost of compliance with the Board's order would be over $388,000. Given the history of good relations between the Union and the employer, and the good faith belief by both sides that something close to an impasse had occurred, the remedy ordered is too drastic, according to Carpenter.

We are constrained to agree. Under the terms of the Act, 29 U.S.C. § 160(c) the Board is mandated, after a finding of unfair labor practice by a person, to issue an order

> requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act].

It has been noted that the Board's mandate calls for orders of a remedial nature, not a "penal program declaring the described un-

fair labor practices to be a crime." *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940). *See also Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 68 (3d Cir. 1978); *NLRB v. Townhouse TV and Appliances, Inc.,* 531 F.2d 826,. 830 (7th Cir. 1976). Thus, courts have refused enforcement of Board orders when they have been considered penal or confiscatory, rather than remedial. *Townhouse TV, supra; Frito-Lay, supra; NLRB v. Dent,* 534 F.2d 844 (9th Cir. 1976).

In effectuating the policies of the Act, the Board is given broad discretion. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Consequently, judicial approval has been given to the Board's power to order a return to the *status quo ante* in terms of wages, *Carnation Co. v. NLRB,* 429 F.2d 1130, 1136 (9th Cir. 1970); *NLRB v. Palomar Corp.,* 465 F.2d 731, 734–35 (5th Cir. 1972); and to order payment of health and welfare benefits according to terms of an expired contract, *Hinson v. NLRB,* 428 F.2d 133 (8th Cir. 1970).

■ We do not hold here that the Board is not empowered to order broad remedial action in the areas of restitution and imposition of the *status quo ante.* Section 10(c) of the Act, 29 U.S.C. § 160(c), mandates that the Board carry out the policies of the Act in fashioning remedies. Section 10(e), however, allows for review by the courts of Board orders, and under that section[1] courts have the power to order modifications in the remedies "when, in the judgment of the court, they go too far." *NLRB v. Local Union 522, Lumber Drivers, Warehousemen & Handlers,* 294 F.2d 811, 812 (3d Cir. 1961); see also *Carnation, supra,* 429 F.2d at 1136.

■ In evaluating each part of the Board's order then, it is necessary to determine if the remedy is remedial or punitive. The cease and desist order, and the order to bargain with the Union are clearly remedi-

---

1. Pursuant to § 10(e), 29 U.S.C. § 160(e), a reviewing court may enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board.

al. The aim of the National Labor Relations Act is to encourage "the practice and procedure of collective bargaining," 29 U.S.C. § 151, and the Board is empowered to "effectuate the policies" of the Act and to "prevent any person from engaging in any unfair labor practice," 29 U.S.C. § 160(a) and (c). Given that a violation of § 8(a)(1) and (5) of the Act occurred when Carpenter unilaterally changed the wages and benefits, a cease and desist order and a bargaining order are appropriate to carry out the Act's policy of protecting employees' organizational rights and encouraging the collective bargaining process. Thus, the employer is required to continue bargaining to actual impasse with the union, on all subjects of mandatory bargaining.[2]

The order to reinstate the strikers with back pay also comes within the remedial purposes of the Act's policies. As found by the Board, the strike by the Carpenter employees was in response to the company's unilateral changes in terms, and was thus an "unfair labor practice strike." Consequently, reinstatement of strikers is a strongly favored remedy. *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); *NLRB v. Foto-chrome, Inc.,* 343 F.2d 631, 633 (2d Cir.), *cert. denied,* 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965); *NLRB v. Fitzgerald Mills Corp.,* 313 F.2d 260, 269 (2d Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). This is true even where replacements have been hired for the striking employees, *Mastro, supra,* 350 U.S. at 278, 76 S.Ct. 349, or where the strike has some elements of economic pressure as well as being an unfair labor strike, *Fitzgerald Mills, supra,* 313 F.2d at 269.

In such a case, back pay to the strikers is also favored. *Fitzgerald Mills, supra,* 313 F.2d at 269. While back pay awards may be considered punitive in some cases, such awards can also be used for remedial purposes. *NLRB v. J. H. Rutter-Rex Manufacturing Co.,* 396 U.S. 258, 265,

90 S.Ct. 417, 24 L.Ed.2d 405 (1969). Thus, requiring back pay for the striking workers in this case was within the Board's discretion.

The remaining parts of the order, however, are unwarranted in the circumstances of this case, and we decline to order their enforcement. The Board urges that we refuse to consider the financial impact of its order on the company at this stage, leaving questions of cost to any further proceeding dealing with compliance. We do not accept the position that we are so narrowly bound in our review at this point, and we feel that an evaluation of the costs to the company is relevant in reviewing the appropriateness of the Board's order. *See Frito-Lay, Inc. v. NLRB, supra,* 585 F.2d at 68; *NLRB v. American Manufacturing Company of Texas,* 351 F.2d 74, 80 (5th Cir. 1965).

This is not to imply that cost to the company is the conclusive factor in reviewing the enforcement order. *See M.S.P. Industries, Inc. v. NLRB,* 568 F.2d 166, 179–80 (10th Cir. 1977); *NLRB v. R. J. Smith Construction Co.,* 178 U.S.App.D.C. 109, 115, 545 F.2d 187, 193 (1976). Courts may also consider the bargaining history of the parties, *Beacon Journal Publishing Co. v. NLRB,* 417 F.2d 1060, 1061 (6th Cir. 1969); the economic conditions of the business, *Trinity Valley Iron & Steel Co. v. NLRB,* 410 F.2d 1161, 1168 (5th Cir. 1969); and whether the employer's violation shows a "brazen" disregard for the Act, *International Union of Electrical, Radio & Machine Workers v. NLRB,* 138 U.S.App.D.C. 249, 255, 426 F.2d 1243, 1249, *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970). In light of these factors, we conclude that the aspects of the Board's order relating to restitution for strike replacements, returning wages and benefits to the status quo, and retroactive payments to the Union welfare and pension funds are unnecessarily harsh, and we deny enforcement of these.

2. This bargaining should include the question of changes in the health, welfare and pension plans, including the issue of retroactive payments. *See* discussion in text, *infra; Beacon Journal Publishing Co. v. NLRB,* 417 F.2d 1060, 1061 (6th Cir. 1969).

■ With regard to the ordering of restitution to strike replacements as well as striking employees, the company was given no notice that it might be held liable for such back payments. The ALJ did not rule on this issue, and neither side argued it at the hearing. Once a contract has expired, it is not a violation of an employer's duty to bargain for it to hire strike replacements at terms lower than those in the expired contract. *Imperial Outdoor Advertising*, 192 NLRB 1248, 1249 (1971). The strike replacements were fully aware of the terms on which they were hired. In these circumstances, the Board's order of restitution for strike replacements was not warranted.

■ The order for retroactive payments to the Union welfare, health, and pension funds is also inappropriate. The order is unclear, since it makes no allowance for offsetting the retroactive payments with the health and welfare benefits which the employer awarded during this time period. While uncertainty in computation is not sufficient reason automatically to deny enforcement, *NLRB v. Darling & Co.*, 420 F.2d 63, 66 (7th Cir. 1970), the lack of clarity here is a valid factor in evaluating the remedy. Given the satisfactory bargaining history of the parties up to this point, the changes in the health and welfare benefits should have been a subject of bargaining between the parties, and not simply ordered by the Board to be carried out. *See Beacon Journal Publishing, supra*, 417 F.2d at 1061.

■ The requirement that Carpenter return the wage and benefit levels to the *status quo ante* in existence before April 18, 1977 is also inappropriate here. When negotiations between the parties started, it was clear that there was a basic disagreement over the levels of wages and benefits. The Union wanted those levels to be higher than those in the new national, multi-employer agreement; the company felt strongly that it could not afford even the levels of the expired national agreement. It was clear that the company would have resisted strongly Union demands calling for wages and benefits at the previous level. In that case, it is unfair to hold the company to the previous contract terms which caused it to withdraw from the multi-employer bargaining unit in the first place. *See NLRB v. Dent*, 534 F.2d 844, 847 (9th Cir. 1976).

■ As noted above, we do not hold that the Board can never order remedial action of the type here. In appropriate cases, restitution orders and requirements of return to the *status quo ante* can be effective ways of implementing the policies of the Act. In the circumstances of this case, however, where a small employer in an economically depressed region with twenty years of good relations with the union makes unilateral changes after some indication that an impasse in bargaining had occurred, extensive and financially crippling remedial action of the type discussed above should not be enforced. "In line with the Act's essentially remedial rather than penal purpose, Board orders . . . must be reasonably adapted to the situation that calls for redress." *NLRB v. Townhouse TV, supra*, 531 F.2d at 830.

Petition for enforcement of order granted in part, denied in part.

VAN GRAAFEILAND, Circuit Judge, dissenting:

We have here a situation in which admittedly the employer withdrew from the National Automatic Sprinkler and Fire Control Association's contract because financially it was too onerous. Despite this fact, when the parties commenced negotiations, the Union advanced a proposal containing provisions more favorable to the Union than were in the National agreement. When this proved completely unacceptable to the employer, the Union representative inquired whether the employer would become a signatory to the National agreement. When company representatives responded that they could not live with either agreement, the Union representative stated that they were at an impasse. This statement was repeated thereafter in several telephone conversations.

In the light of the foregoing facts, the Board's holding that the employer was guilty of an unfair labor practice for relying upon the Union representative's statements that "we are at an impasse" and "[y]ou and I cannot agree" was manifestly unfair and without substantial evidentiary support. I would therefore deny enforcement of the Board's order.

I am also unable to agree with my colleagues' holding on the admissibility of the tape recording. Where, as here, the testimony of a Union representative on a vital matter is clearly impeached by a recording of his prior statements, I cannot accept the argument that the recording's admission into evidence would harm the collective bargaining process. The integrity of the Board's fact-finding process is as important a factor in this country's labor-management relations as are the cross-the-table negotiations that precede Board review.[1] If the Board's search for the truth is not to degenerate into a game, see *NLRB v. Selwyn Shoe Manufacturing Corp.*, 428 F.2d 217, 225 (8th Cir. 1970), if the parties are "to conduct such cross-examination as may be required for a full and true disclosure of the facts", 5 U.S.C. § 556(d), evidence that replaces untruth with truth should not be excluded.

Were I to agree with the majority that enforcement of the Board's order should be granted, I would concur in the modifications of the sanctions imposed. They ameliorate, at least in part, the inequity resulting from the Board's determination.

---

1. "It is sometimes forgotten that the National Labor Relations Act deals with people's livelihoods and that the stakes in an unfair labor practice hearing are consequently extremely high."

*International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB,* 148 U.S.App.D.C. 305, 318, 459 F.2d 1329, 1342 (1972).