**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAVIN BUSINESS MACHINES CORPORATION, Respondent.**

**No. 80–1645.**

United States Court of Appeals, First Circuit.

Argued March 4, 1981.

Decided May 29, 1981.

assessment that no further action was required.

Allison W. Brown, Jr., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and J. Keith Gorham, Atty., Washington, D.C., were on brief, for petitioner.

Edward N. Schwartz, East Orange, N.J., for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI, District Judge.*

COFFIN, Chief Judge.

The National Labor Relations Board petitions for enforcement of its order directing the respondent, Savin Business Machines Corporation, to reinstate with back pay its former employee, Stuart Portner. The Board adopted the findings of the Administrative Law Judge and held that Savin had discharged Portner because of his union organizing activity in violation of §§ 8(a)(1) & (3) of the National Labor Relations Act. Because this decision is supported by substantial evidence on the record as a whole, we will enforce the order as modified.

The undisputed facts cover a relatively short compass. Portner was actively engaged in soliciting authorization cards for the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America several months before his discharge. Portner's job responsibilities were to service and repair business machines sold or leased to Savin customers, usually at the customer's place of business. In terms of technical proficiency, Portner was acknowledged by the company to be not merely good, but excellent. Supervisor

---

* Of the District of Massachusetts, sitting by designation.

Pena testified that Portner "was probably the most technically competent person I have ever met." Several months before his discharge, Portner received a letter of commendation from Savin's corporate president and a cash prize for his suggestion for improving a company product, the third such suggestion of Portner's accepted by the company. Despite these signs of success, Portner was dissatisfied with working conditions at Savin. He expressed his discontent to other employees and sometimes protested his job assignments. In particular, Portner frequently failed to comply with the company's dress code, notwithstanding promises of improvement.

Beyond these facts, the company's version of events departs radically from that advanced by the General Counsel and adopted by the ALJ. The company maintains that it discharged Portner for an accumulation of offenses and misdeeds, in themselves minor, which, when taken together, demonstrated a "bad attitude" and insubordination. The company's position is that it was willing to tolerate Portner's shortcomings because of his technical excellence during its earlier, leaner years, but that by 1977 the Boston office's outlook had improved, and its staff of technicians had increased to the point where Portner's expertise became expendable. The final straw, according to the company, came on December 14, 1977 when Portner called the office to report that his car was disabled and he could not make his service calls. Portner had called earlier in the morning to notify the office dispatcher that he was trying to have the car repaired. Service technicians are required to provide their own transportation on service calls. The second time Portner called, supervisor Pena spoke with him and asked that he come to the company's Brighton facility. Portner replied that he could not obtain transportation and an argument ensued. Pena could not remember the argument in any detail, except that it generally concerned Portner's inability to get transportation and lasted 20–30 minutes. Pena ended the conversation by discharging Portner.

The company does not rely on this incident alone, but on the combined effect of this and several other preceding infractions of company rules. Several company witnesses testified to customer complaints about Portner's dress and "attitude", although no written record was made of them. The company also relies on an incident occurring sometime in September or October 1977 when supervisor Pena observed Portner apparently stealing switches from a company parts room. Once again no written record was made of the event. Plant manager Raffa testified that he would have fired Portner for this, but he felt that the evidence was insufficient. Finally, the company asserts that Portner "moonlighted" by accepting pay directly from customers for after-hours work. Portner, according to the company, charged two customers directly after he had been denied permission to do so. The company denies any knowledge that Portner was engaged in organizational activity.

The General Counsel presented testimony by Portner, credited by the ALJ, that on or about August 17, 1977, supervisor Pena had observed Portner distributing union authorization cards in the company parking lot [1] and later that same day had threatened Portner with loss of his job if he continued "making trouble" and "leading a revolution". Thereafter, in late August or early September, employee Mendes testified that supervisor Pena told him and several other technicians that "a union wouldn't do anybody any good" and asked the rhetorical question "what [is] Mr. Portner . . . trying to prove by starting a union here"? In September, after the union organizing campaign had fizzled out, Portner testified that he began receiving "bogus calls"—service calls to a location where there was no repair work to be done. Before his union activi-

---

1. We fail to understand the significance of the discrepancy asserted by the company between Portner's testimony that Pena saw *him* in the parking lot and the ALJ's summary statement that Portner saw *Pena*. Obviously, Portner watched Pena watch him. Moreover, the ALJ's "version", if different at all, was more favorable to the company than Portner's.

ties, Portner testified that he received one or two such calls a week; afterwards he received as many as four in one day. "Bogus calls" waste time and make the technician appear less productive. Portner testified that when he questioned a dispatcher about the problem, the dispatcher replied that the calls had been placed in his assignment box by supervisor Pena.

■ This evidence was sufficient to establish a prima facie case of anti-union motivation for Portner's discharge. *NLRB v. Eastern Smelting & Ref'g Corp.*, 598 F.2d 666 (1st Cir. 1979). Portner's credited testimony, corroborated in important part by that of Mendes, showed that the company's supervisors knew of Portner's union activity, warned him to stop it, and, when that failed, attempted to harass him and possibly to lay a foundation for his discharge. The prima facie showing shifts the focus of inquiry to the company's proferred legitimate business justification for the discharge. *Id.*, 589 F.2d at 671.

The General Counsel's evidence in rebuttal concentrated on the events leading up to the telephone conversation during which Portner was discharged, thus meeting the company's theory that this apparently minor incident was in fact the crowning blow of a long-standing pattern of misbehavior. As to the customer complaints, company dispatcher Johnston testified that customers complained about other technicians as well. Johnston also testified that Portner was given an average of 7 to 8 assignments daily, or between 1,750 and 2,000 annually in a fifty-week work year. Of this number, company witnesses could recall only three instances where customers had complained about Portner and in none of those instances was Portner warned or disciplined in any way. Nor was Portner disciplined after his alleged theft of parts from the company supply store. Supervisor Pena testified that when he found Portner in the parts room, a "restricted area", and demanded an explanation, Portner replied that he was picking up switches to repair a customer's equipment. Employee Mendes testified that it was common practice for technicians

to sign out parts on their own when no supervisory personnel were present. As to Portner's alleged "moonlighting", there is no dispute that the company permits such "moonlighting" with prior approval. Portner testified that he was given explicit approval; the company witnesses denied this. The ALJ resolved the credibility dispute in favor of Portner. Finally, there is also no dispute that Portner had been a sloppy dresser during his entire eight year tenure with the company and that the company had never pressed him beyond his periodic assurances that he would try to improve his appearance.

Based on this evidence the ALJ concluded that Portner's misdeeds took on importance only after his discharge. On this view, even assuming as true the company's version of the discharge incident, the ALJ decided that Portner's inability to satisfy Pena's demand that he find alternate transportation on this single occasion could not have been the true reason for his discharge. He therefore concluded that "but for" Portner's union activities, he would not have been discharged. We find the ALJ's finding of pretext to be supported by substantial evidence. The ALJ was entitled to discredit the company's story that despite its mounting frustration with Portner's performance, it never once disciplined him or even placed a reprimand in his personnel file for any of his alleged acts of misconduct. Particularly damning in this regard is the company's policy, stated in its Branch Office Procedure manual:

"Whenever unsatisfactory performance or behavior occurs, the supervisor or manager should deal with the situation promptly, constructively and in a tactful manner in order to: . . . . d. Assure that documentation is available to support management's position in the event of discrimination or labor claim charges."

The company's principal objection to the ALJ's decision is his crediting of employee Mendes' testimony going to the General Counsel's prima facie showing of improper motivation. This contention is not without some force. Mendes admitted to being a

friend of Portner's and to having been denied a wage increase by the company shortly before a Board agent took his statement. He showed some sign of bias in Portner's favor by failing to recall on cross-examination that Portner sometimes dressed in jeans. Mendes' testimony regarding supervisor Pena's anti-union remarks was contradicted by company employees Larner and Dubeau as well as by Pena.

 The ALJ noted this credibility conflict and expressly decided in favor of Mendes' version. The reasons given for this determination were that Mendes appeared to be a candid and forthright witness, Mendes testified against the respondent's interest while still employed (the same was not true for Larner, Dubeau, and Pena, also currently employed) and Mendes would not likely have fabricated the incident based on his friendship with Portner by placing two other technicians, still employed, at the site of the conversation. Within the bounds of reason, it is the ALJ's judgment, not ours, that is controlling on issues of credibility. *See, e. g., NLRB v. Yale Mfg. Co.*, 356 F.2d 69, 72, 74 (1st Cir. 1966). Mere numerical superiority of witnesses, or the possibility of bias is not sufficient to put the question beyond the realm of reasonable dispute. We see no basis to upset the ALJ's credibility determination in this instance.[2]

We have considered the company's other contentions and, with one exception, find them to be without merit. The ALJ properly could deny the company's motion to reopen the record to admit, on the issue of Portner's credibility, evidence that Portner had participated in a robbery at the company almost a year *after* his discharge.

To the extent this evidence was at all relevant to credibility, the ALJ was not bound to open the record on that issue alone. *NLRB v. Jacob E. Decker and Sons*, 569 F.2d 357, 365 (5th Cir. 1978). We note, as did the Board, that the company's allegations, if true, would obviously have a great bearing on Portner's right to reinstatement and back pay and may yet be introduced on those issues at the compliance stage of these proceedings.

The company's contention that the broad cease and desist order entered against it is not supported by the evidence is sound. All union activity ceased several months before Portner's discharge, apparently by voluntary choice of the employees. There is no evidence of continuing organizational activities at Savin or that Savin has engaged in broad scale unlawful activity. Accordingly we will modify the order and notice of the Board by eliminating the catch-all paragraph 1(b) of the order and substituting the form of notice proposed by the ALJ for that entered by the Board. *See, e. g., NLRB v. Beth Israel Hospital*, 554 F.2d 477, 483 (1st Cir. 1977), *aff'd*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978).

*As so modified, the order will be enforced.*

---

2. Nor will we disturb the ALJ's acceptance of Portner's version of his conversation with Pena based in part on demeanor evidence and in part on a transcript of a surreptitious tape recording of the conversation prepared by Portner. The policy argument in favor of banning such recorded evidence of collective bargaining—its inhibiting effect on free bargaining discourse, *see Carpenter Sprinkler Corp., v. NLRB*, 605 F.2d 60, 66 (2d Cir. 1979)—is greatly diminished, if applicable at all, in the context of a single employee-supervisor conversation. The Board is entrusted with wide discretion in evidentiary decisions. *Id.* It is not required to apply automatically the rules of evidence applicable in the federal courts. 29 U.S.C. § 160(b). We think that under the circumstances present here it was not error for the ALJ to admit the tape and transcript for the limited purpose of verifying credibility. Although the transcript was less than a model of clarity, we note that the company was offered the opportunity during a continuance of the hearing to inspect the tape for authenticity and to compare it with the transcript for accuracy.