**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ORANGE COUNTY PUBLICATIONS, an Unincorporated Division of Ottaway Newspapers, Inc., d/b/a/ The Times–Herald Record, Respondent.**

Docket No. 01–4040.

United States Court of Appeals, Second Circuit.

Nov. 20, 2001.

Richard J. Lussier, Attorney, National Labor Relations Board; Linda J. Dreeben, Assistant General Counsel, Washington, DC, for petitioner.

Richard A. Perras, Edwards & Angell, LLP; Ira G. Greenberg, on the brief, New York, NY, for respondent.

Present MINER, McLAUGHLIN and STRAUB, Circuit Judges.

### SUMMARY ORDER

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HERE-BY ORDERED, ADJUDGED AND DE-CREED that the petition for enforcement is GRANTED.

Pursuant to 29 U.S.C. § 160(e), Petition-er National Labor Relations Board ("NLRB" or "Board") applies for enforce-ment of its decision and order finding that Respondent Orange County Publications ("OCP") violated sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain with Local 1120, Communications Workers of Amer-ica, AFL–CIO (the "Union"). OCP admits its refusal to bargain with the Union, but argues that its failure to do so does not violate the Act because the Union was improperly certified by the NLRB as the result of an underlying representation case

(Board Case No. 34–RC–1539). We grant the petition.

## BACKGROUND:

OCP publishes and circulates The Times–Herald Record, a daily community newspaper, in Middletown, New York. In the fall of 1997, the newspaper employed 61 full-time and regular part-time bulk newspaper delivery drivers, none of whom belonged to a union. The union sought to change this and began an organizational drive which culminated in the filing of a representation petition on February 2, 1998, seeking NLRB certification as the drivers' exclusive bargaining agent. In a subsequent mail ballot election, the Union was defeated: the final tally had 14 drivers for unionization and 45 against, with 2 voided ballots.

The Union immediately contested the results, filing ten objections (two of which were soon withdrawn) with the NLRB. The Union based its objections in part upon a pre-election group meeting held by James Moss, the newspaper's publisher, and attended by 22 of the drivers. Specifically, the Union charged that some of Moss's comments at the meeting contained threats of reprisal in violation of section 8(a)(1) of the Act.

The hearing officer appointed to adjudicate the case found that several statements attributed to Moss had compromised the election's integrity, and sustained the first two of the Union's eight remaining objections. In upholding the first objection, the Hearing Officer found that Moss had made an "implied threat to job security;" in upholding the second, she found an "objectionable statement about the futility of bargaining." Both these findings were based in large part on a Union supporter's surreptitious audiotaping of the speech and a transcript of that tape prepared by a stenographer the Union hired.

The OCP responded by filing exceptions with the Board charging that 1) the Hearing Officer had abused her discretion in allowing the tape and transcript to be entered into evidence, and 2) that even if the tape and transcript were properly considered, her conclusions about the significance of Moss's statements were erroneous because those statements constituted legitimate commentary regarding the likely consequences of unionization under the rule of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–19, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In a 2–1 decision, the Board upheld the hearing officer's findings and recommendations and ordered that the election results be set aside and a second election be conducted. The Board certified the Union as the drivers' exclusive collective bargaining representative on November 18, 1998, eight days after the Union won the second election.

Because that decision ordering the second election was not appealable prior to the election, OCP refused to bargain with the Union in order to perfect the issue for appeal. In response, the Union filed an unfair labor practice charge alleging that OCP had violated sections 8(a)(1) and (5) of the NLRA by refusing to bargain with the Union and refusing to provide the Union with reasonable access to its facility following the Union's certification. The Board's General Counsel then issued a complaint based on the Union's allegations on February 9, 1999, and filed a motion for summary judgment. OCP filed its response, the Board granted the motion and this appeal followed after OCP refused to adhere to the Board's order.

## DISCUSSION

### A. *Standard of Review*

As the unfair labor practice order at issue is predicated in large part on findings made in the underlying representa-

tion case discussed above we review the merits of that decision pursuant to 29 U.S.C. § 159(d). *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477–79, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

We have traditionally applied a tripartite standard of review when considering issues arising under the NLRA. Questions of fact must be supported by "substantial evidence" in light of the record as a whole. *See* NLRA §§ 10(e) & (f), 29 U.S.C. §§ 160(e) & (f); *Elec. Contractors v. NLRB*, 245 F.3d 109, 116 (2d Cir. 2001). Under this standard, "reversal based on a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Katz's Delicatessen*, 80 F.3d 755, 763 (1996) (internal quotation marks omitted). Similarly, the Board's legal conclusions must only have a "reasonable basis in law." *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir.1995). Mixed questions of law and fact are reviewed *de novo*, though we "defer to the Board's decision when there appears to be more than one reasonable resolution and the Board has adopted one of these." *Sheridan Manor Nursing Home, Inc. v. NLRB*, 225 F.3d 248, 252 (2d Cir.2000), citing *Beverly Enters., Inc. v. NLRB*, 139 F.3d 135, 140 (2d Cir.1998).

While all three of these standards entail a significant degree of deference, Board decisions regarding the conduct of representation elections are typically reviewed in a particularly relaxed manner. *See NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970); *see also Contech Div., SPX Corp. v. NLRB*, 164 F.3d 297, 305 (6th Cir. 1998). The Board, unlike the judicial branch, possesses substantial expertise in the supervision of elections, and is thus accorded "broad discretion to determine whether the circumstances of an election come sufficiently close to laboratory conditions so that employees can exercise free choice in deciding whether to select the Union as their representative." *Amalgamated Servs. v. NLRB*, 815 F.2d 225, 227 (2d Cir.1987). Finally, a divided Board's decision may often be accorded slightly less deference by this court. *See Nat'l Mar. Union of Am. v. NLRB*, 867 F.2d 767, 772 (2d Cir.1989).

### B. *Admissibility of the Tape*

The Board's decision did not expressly review the admissibility of the tape. Significantly, however, all three of its members relied on the tape and/or transcript in reaching their decision on the merits of the objections. Moreover, the admissibility of tapes recorded under similar circumstances is supported by much of the Board's precedent, *see, e.g., McAllister Bros. v. Seafarers Intern. Union of N.A.*, 278 N.L.R.B. 601, 601 n. 2, 1986 WL 54168 (1986); *Algreco Sportswear Co. v. International Ladies' Garment Union, Local 420*, 271 N.L.R.B. 499, 505, 1984 WL 36788 (1984); *E. Belden Corp. v. Bartenders and Culinary Union, Local 126*, 239 N.L.R.B. 776, 782, 1978 WL 8310 (1978) *enforced* 634 F.2d 635 (9th Cir.1980), though the Board has at times fashioned a different rule, *see, e.g., Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 66 (2d Cir.1979). Nevertheless, the rule is the Board's to fashion. "The rules of evidence prevailing in courts of law or equity shall not be controlling" in Board hearings concerning objections to conduct during representation elections. 29 C.F.R. § 102.66(a). Congress has entrusted the Board with wide discretion in regard to evidentiary decisions, and the Board in this case did not abuse that discretion. *Carpenter*, 605 F.2d at 66.

In arguing for the exclusion of the tape, OCP contends that "the recording was garbled and incomplete ... with significant sections being identified as 'inaudible'

by the Union's stenographer," and that the Hearing Officer abused her discretion further by reviewing the tape *in camera* and revising the transcript accordingly. While these arguments may have some merit, they go to the weight of the tape and not its admissibility.[1] The vagaries of the tape are but one factor in determining whether the Board correctly sustained the Union's objections.

### C. Objections 1 and 2

■ The Union's first objection concerns the following statement made by Moss during the group meeting:

Let's work together to make this company, stronger, not lets find a way to fight with one another and make the company weaker.

That is what it ends up being. Let's do some stuff to try and weaken the company. *And if that is what you want to do, ultimately, you have to realize that all of that stuff is going to have a negative impact on the company. If we need to, right now there could be a less expensive way to deliver the "Times–Herald Record" than the distribution system that we've got.*

We have never availed ourselves of those other mechanisms. We have out front looked for ways to keep our costs under control, and where there was not a need for full time drivers. The window for our distribution is between twelve and four o'clock. That is when the papers come off the press. Those are not eight hour jobs, yet we have done some things for some body of the jobs that we have. We have done some things on the front end and the back end to try to stretch the jobs into full-time, but we cannot do that for every job.

But what we have tried to do is to keep people employed on a full-time basis everywhere where it made economic sense. Where it doesn't, we cannot do that and we won't do that, even with a union.

So, these are the realities of the situation, and we all just ought to go into this thing with our eyes completely wide open. Yes. Maybe they do not strike, but they sure tried to do some other things to hurt us.

From this statement, the hearing officer concluded, and the majority of the Board agreed, that Moss had made "an implied threat that unionization, with the attendant tactics of the Union, would have a negative impact on the company and lead it to turn to less expensive distribution systems than were in place." This in turn constituted an implied threat to the drivers' job security, insinuating that "employees ran the risk of losing their jobs if they selected the Union."

OPC contends that Moss's statements, when viewed in context, "constituted nothing more than legitimate commentary on the likely consequences of unionization" and was intended to "reassure the employees that the company's practice of protecting employees' jobs would not change 'even with a union.'" In addition, OPC correctly notes that Moss does not repeat his threat at any other time during the meeting, which lasted two and a half hours.

Determining whether Moss's statement constitutes objectionable conduct calls for an extremely fine distinction. Under the deferential standard articulated above, we can reverse only if the Board's position is untenable, which is clearly not the case here. We sustain the objection.[2]

---

1. OCP's arguments are weakened by the fact that Moss's testimony at the original hearing provided corroboration for most of the statements heard on the tape.

2. We limit our finding that the Board acted reasonably to the election context, an area in which the Board has been accorded uncommonly broad discretion and applies a fairly

Having resolved Objection 1 in the Board's favor, we see no need to reach the merits of Objection 2.

CONCLUSION:

The Board's petition for enforcement is granted.

demanding standard. *See, e.g., Amalgamated Servs., 815 F.2d at 227; Contech,* 164 F.3d at 305, 307.