**WYMAN–GORDON COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1675.

United States Court of Appeals, First Circuit.

Argued May 5, 1981.

Decided July 20, 1981.

Columbus R. Gangemi, Jr., Chicago, Ill., with whom George B. Christensen, Gerald C. Peterson, and Winston & Strawn, Chicago, Ill., were on brief, for petitioner.

Robert I. Tendrich, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Washington, D. C., were on brief, for respondent.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI, Senior District Judge.*

BREYER, Circuit Judge.

Wyman-Gordon Company, the petitioner here, is a Massachusetts corporation headquartered in Worcester. Since 1976, the company has operated a facility in Danville, Illinois, devoted to the manufacture of crankshafts and other metal forgings. In June 1979, the approximately 140 hourly employees at the Danville plant elected to be represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. That success did not come easily to the union; a previous organizational drive conducted in early 1978 had fallen short, and the outcome of the 1979 election was determined by the disposition of challenges to five ballots. In March and April 1979, while the second union campaign was gaining steam, the union filed charges against the company alleging various violations of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1970). After holding seven days of hearings, the ALJ concluded with respect to most of the General Counsel's allegations that the company was guilty as charged. Specifically, he found that the company (1) violated § 8(a)(3) both by discharging Daniel Wilson and by refusing to hire David Stark, in each instance because of the individual's union activities, and (2) violated § 8(a)(1) on thirteen separate occasions by coercively interrogating or threatening eight different employees, and one applicant for employment, with respect to their union involvement. The National Labor Relations Board summarily affirmed the ALJ's decision and order. The company now petitions for review and the Board cross-applies for enforcement.

### I.

#### The Discharge of Daniel Wilson

We first treat the question of whether the company's discharge of Daniel Wilson violated § 8(a)(3) of the Act.[1] Our reading

---

* Of the District of Massachusetts, sitting by designation.

1. Section 8(a)(3) provides in pertinent part: "It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3) (1970).

of the record reveals the following: Wilson joined the company in February 1976 as a security guard. After transferring to the industrial relations office and then returning to his security post, in February 1978 he was accepted as an electrician trainee in the maintenance department. As part of the company's three-year maintenance training program, Wilson was required to complete a course in industrial electricity offered in the fall of 1978 by the Danville Area Community College. The course met for two hours and five minutes twice a week from August 21 through December 17. Wilson initially attended Professor Blackburn's section which met each Tuesday and Thursday at 9:00 a. m. Prompt attendance at this morning class proved inconvenient to Wilson, however, when in September he was transferred to the third shift at the plant. He therefore sought and received permission to attend, beginning on September 26, the afternoon session of the course, taught by Professor Rape on Mondays and Wednesdays at 1:00 p. m. As with all such trainees, the company not only paid Wilson's tuition and provided all necessary books and materials, but also compensated him at his regular hourly rate for all time—whether on-shift or off-shift [2]—that he spent in the classroom. For on-shift classes, such compensation included an allowance of fifteen minutes each way for travel to and from the college.

Brock Blinn, a staff assistant in the industrial relations department, supervised all aspects of the training program including the college course work. By letter dated September 18, 1978, he advised the instructors of each of the four trainees studying at the college [3] that the trainees were being paid for their class time, that attendance should be recorded and that he would periodically check the attendance record; he had earlier informed the trainees that they were expected to attend. On January 2 and 3, 1979, Blinn sought to telephone the instructors in order to audit class attendance; the college was on semester break, however, and he was unable to reach them until January 15. On that day, after consulting his attendance book, Rape reported to him that Wilson had been absent from the afternoon class on nine occasions—October 23 and 25, November 1, 6, 8, 20, 27 and 29, and December 4—and that he had been unable to complete a practical wiring exam given near the end of the course.[4] Alerted to the possibility of employee dishonesty, Blinn expanded his investigation by requesting Russell Chaney, then the accounting supervisor at the Danville facility, to determine whether Wilson had been paid for the missed classes. After examining the payroll records, Chaney discovered, and reported to Blinn, that Wilson had received payment for all scheduled classes, at least for the period from September 15 through December.

2. In order to gain exposure to all facets of the company's operation, each trainee was required to change his work shift on a monthly basis. Wilson's schedule was as follows: August—day shift (7:00 a. m. to 3:30 p. m.); September—third shift (11:00 p. m. to 7:30 a. m.); October—day shift; November—second shift (3:00 p. m. to 11:30 p. m.); and December—third shift. His classes thus occurred on-shift in August and October, off-shift in September and December, and predominantly off-shift (with a twenty-minute overlap) in November.

3. In addition to Wilson, three other maintenance department employees—Wes Wheeler, Harold Hinzman, Jr., and Ross Trimmell—were taking courses during the fall 1978 semester. Each of them was studying a different subject.

4. Wilson also missed the class on November 22. Although Rape apparently made no mention of this absence in his January 15 conversation with Blinn, it was listed in the disciplinary notice which the company submitted to Wilson at the time of his discharge. Consequently, although the record fails to disclose when or from whom, it is evident that the company learned of this tenth absence prior to that date. At the hearing, Rape recalled the November 22 absence because Wilson had been scheduled to take the practical exam on that date. Having been absent on November 20 when the exam times were allocated, he was presumably unaware of this fact. The exam was given to different groups of students on each of four days: November 22, 27 and 29 and December 4. Wilson missed each of these classes and ended up taking (and failing to complete) the exam after class on review day, December 6.

On January 29, 1979, Blinn and Vernon Gehrke, the general supervisor of the maintenance department, met with Wilson and confronted him with a handwritten list of the absences earlier enumerated by Rape. In the face of conflicting testimony, the ALJ found that Wilson offered various excuses for the cited absences, "including that he was on vacation during part of the semester; that his son was ill; that he had reported late for class on two occasions; and that another class had been cancelled." [5] Wilson admitted missing four or five scheduled classes but protested that he had reported these absences to various company officials and should not have received payment for them. The ALJ also found that Wilson offered to make restitution "for any classes for which he had been paid"—an offer rejected by Blinn and Gehrke.[6]

Following this meeting, Gehrke inquired of Barry Kennedy, a maintenance planner at the plant, whether Wilson had ever reported being absent from class; as Gehrke recollected this conversation at the hearing, Kennedy replied that Wilson "might have told me [about] one or two." [7] Meanwhile,

**5.** In his testimony, Blinn recalled Wilson on January 29 explaining his absenteeism on the grounds that (1) he had been on vacation on October 23 and 25 and November 1; (2) his son had been hospitalized on November 6 and 8; (3) he had been late to class on November 27 and 29; and (4) one (unidentified) class had been cancelled on account of a Danville High School football game. Wilson, by contrast, testified that he explained at this meeting that he had missed only four classes: those on November 1, 6 and 8 because of his son's hospitalization, and that on December 4 because of a dental appointment. Gehrke's recollection of this part of the conversation, interestingly enough, largely paralleled that of Wilson, differing only in that he recalled an additional reference to a class cancellation; he made no mention in his testimony of a vacation in October or tardiness in November.

These conflicts in the underlying evidence reveal a regrettable ambiguity in the ALJ's findings on this issue. It appears from the face of his opinion that the ALJ credited Blinn's version of this conversation; his findings correspond most closely to Blinn's testimony, and his reference to the class cancellation suggests that he rejected Wilson's account at least in part. Yet, whether the ALJ's finding that Wilson claimed to have been on vacation "during part of the semester" refers to the October dates, and whether his finding that Wilson claimed to have "reported late for class on two occasions" refers to the end of November—all as Blinn testified—are important but unresolved questions. If Wilson in fact offered these excuses, they were untrue; as we describe below, Wilson was on vacation in early September rather than late October, and he was entirely absent from class on November 27 and 29. The company did introduce into evidence a handwritten sheet on which Blinn, purportedly in reflection of Wilson's comments at the January 29 meeting, had placed the words "vacation" and "late" next to the respective dates in October and November to which he testified. Notwithstanding this evidence, however, we are unable to interpret the ALJ's equivocal findings in this manner. That Gehrke failed to recollect any such comments by Wilson is obviously noteworthy. Moreover, the record reveals that, immediately prior to testifying about his *statements* at the January 29 meeting, Wilson was questioned about his *actions* during the college semester. In addition to reciting his four medically-related absences, he explained that (1) he had missed two *classes in September while on vacation;* (2) he had been late to at least one September class prior to transferring to the afternoon session; and (3) Rape had cancelled the November 22 class. Consequently, the possibility exists that, in his findings concerning the excuses offered by Wilson at the January 29 meeting, the ALJ did not credit Blinn's testimony concerning the references to a vacation and tardiness, but instead mistakenly incorporated Wilson's version—not of what was then said—but of what in fact earlier occurred.

**6.** *This last finding by the ALJ appears almost as a compromise between Blinn's and Gehrke's recollection—that Wilson had offered immediately and unconditionally to repay the cited overpayments—and Wilson's testimony that he had offered only to repay any money that they could prove was owed. Implicit in the ALJ's finding is the suggestion, never explicitly stated, that Wilson on January 29 denied having been aware of his receipt of compensation for missed classes. Although Blinn testified that Wilson never voiced such a denial at this meeting, Wilson in his testimony suggested that he did, at least implicitly.*

**7.** At the hearing, Kennedy was questioned only about whether Wilson had in fact reported any absences to him, not about his reply to Gehrke on this question. In his testimony, he indicated that Wilson had informed him of one absence because of his son's hospitalization and had complained of difficulties in attending the morning class while working the third shift in

Blinn telephoned Rape and learned that at least one of Wilson's proffered excuses was inaccurate: Rape denied ever having cancelled or postponed a class.[8] Blinn also spoke with Chaney about the circumstances surrounding Wilson's receipt of a twenty-five dollar cash advance as payment for two missed classes. Chaney informed Blinn that, due to an administrative oversight, payment for the schooling of the four trainees for the week ending October 28 had been omitted from their paychecks. Jacque Marbury, the payroll control clerk, had notified them of the omission and, in accordance with company policy, had offered them the option of either receiving an immediate cash advance or awaiting an adjustment in their next paychecks. Wilson had opted for the former and, on November 3, had signed a receipt and received a twenty-five dollar cash advance as compensation for his attendance at the October 23 and 25 classes. Blinn, having learned from Rape that Wilson had been absent on these dates, inquired of Chaney whether Wilson had been aware of the reason for the advance. As Chaney explained at trial, he told Blinn that "there was no way [Wilson] could have received the money without knowing what it was for."[9] Based upon this information,

Blinn recommended to Donovan that Wilson be discharged for theft. Donovan, a relative newcomer to the company, called the regional director, James Adams, to inquire about the appropriateness of such a response. Adams indicated that it was the company's policy without exception to terminate employees for intentional misuse of company funds; he described several such instances in the past[10] and assured Donovan that termination was justified in Wilson's case.

On February 2, Donovan, Blinn and Gehrke reviewed the matter and decided to discharge Wilson for violation of the company rules proscribing "stealing in any form" and "conduct that violates common decency and honesty." Wilson was then called to the meeting. As the ALJ found, "[t]he charges against Wilson were reviewed and Wilson again offered to pay for any absences established by [the company] for which he had been paid." This proposal was again rejected and, in accordance with the company's policy, Wilson was temporarily suspended pending discharge. Following this meeting, Blinn requested and received written confirmation of Wilson's attendance record from Rape.[11] On February

September. Wilson, by contrast, testified that he had reported his absences on November 1, 6 and 8—all due to his son's illness—to Kennedy and his absence on December 4—due to his dental appointment—to Kennedy and two other managers. As discussed below, the ALJ credited Wilson on this issue.

8. According to his testimony, Blinn at this time also checked, and found to be untrue, Wilson's alleged references to being on vacation in October and being late to class on November 27 and 29. If Wilson in fact voiced these excuses, but see note 5 supra, they were clearly inaccurate. The evidence was undisputed that Wilson's only vacation during this period occurred in the first week of September. And, Rape testified that Wilson was entirely absent on November 27 and 29. Perhaps more importantly, all students were expected to attend only one of the four classes—November 22, 27 and 29 and December 4—on which the practical exam was administered; had Wilson actually arrived late on two of these dates, he presumably would have been sent home.

9. Blinn also learned during this time that Wilson had been paid for four additional absences

in September prior to his transfer to Rape's class. However, because Wilson had mentioned to Blinn when requesting such transfer that he had "missed some classes," these absences were not considered in the decision to discharge him. Shortly before the hearing, Blinn learned in addition that Wilson had been paid for the two classes missed during his September vacation; these absences of course also played no role in the discharge decision.

10. Adams cited as examples the theft of twenty dollars worth of a metal alloy and of a fifty-five gallon drum of oil; at trial, he expanded this list to include the theft of a "small" amount of money from a petty cash box and the falsification of a timecard. He also stated that, in each of these cases, the employee had admitted guilt.

11. Rape's letter, dated February 5, read in part:

[Wilson] began attending my class on the 27th of September and attended regularly until mid-term (dates 2, 4, 9, 11, 16, 18 of October). He then missed a complete week and from then on his attendance was poor. The dates he attended during the second half

6, after being presented with, and refusing to sign, an unsatisfactory performance notice listing ten absences from October 23 through December 4 for which he had. been paid, Wilson was officially discharged.

In a dual motive case such as this one, the initial inquiry is whether the Board has made a *prima facie* showing that a " 'significant' improper motivation" underlay the discharge decision. *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979); *accord, NLRB v. Amber Delivery Services, Inc.*, 651 F.2d 57 at 68 (1st Cir. 1981); *Statler Indus., Inc. v. NLRB*, 644 F.2d 902, 905 (1st Cir. 1981). Although the ALJ did not explicitly make such a finding, we believe he did so implicitly and with the requisite record support. For one thing, Wilson was involved with the union and the company was aware of his involvement. *See, e. g., NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 118 (1st Cir. 1978). There was evidence that, from December 1978 through the date of discharge, Wilson was an active participant in the union's organizational effort—distributing literature, soliciting signatures on authorization cards and sporting a union button and sticker on his hard hat. There was also contrary evidence, suggesting that at least until the middle of January Wilson's union involvement was peripheral and covert. But this latter evidence was not credited by the ALJ, and we decline to disturb that determination. In any event, it was uncontroverted that Wilson had overtly demonstrated his sympathies, if not by the time Blinn initiated his investigation, than at least well before the date of discharge; this evidence was sufficient to call the company's motivation into question.

For another thing, there was enough evidence that Wilson's treatment was unusual

to suggest that his union involvement figured prominently in the discharge decision. Wes Wheeler, another maintenance trainee studying at the college, was shown to have received payment for two missed classes.[12] Blinn learned of these absences from Wheeler's instructor between January 15 and February 15; upon determining that Wheeler had received payment for them, he notified Donovan and Gehrke. However, notwithstanding the company's professed policy of strictly and consistently punishing employee dishonesty, not only was Wheeler never disciplined for the two paid absences, but the matter was never brought to his attention. The disparate treatment of Wheeler and Wilson in response to seemingly identical offenses is obviously suggestive of improper motivation. Moreover, Wilson offered testimony, credited by the ALJ, that he had informed Kennedy of the four absences on November 1, 6 and 8 and December 4 and had also mentioned to Blinn and another supervisor that he had missed several classes in September. None of these individuals notified the accounting department of Wilson's absences (as Kennedy acknowledged he should have done) in order to permit the necessary payroll adjustments to be made. This laxity contrasts rather sharply with the rigidity of the company's subsequent action, thereby reinforcing the inference that these events provided a convenient pretext for discharging a union adherent.

Since the Board made out a *prima facie* case of antiunion motivation, the burden shifted to the company to establish "that it had a good reason, sufficient in itself, to produce the discharge." *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 671, *quoted in Statler Indus., Inc. v.*

---

of the semester were October 30, Nov. 13 and 15 and Dec. 6. His poor attendance led to a very poor practicle [*sic*] examination and a poor grade for the course.

Wilson received a grade of "D" on the practical exam, a "B" on the final exam, and, along with four other students, a "C" as his final grade— the lowest mark given by Rape.

12. Wheeler's instructor actually informed Blinn that six absences had occurred, but subsequent investigation showed that he had only received payment for two. On October 27, 1978, Wheeler had completed the company's training program and as a result had ceased receiving class payments. *He had gained permission, however*, to continue attending the course, without compensation, on his own time. Four of the six absences had occurred after this date.

*NLRB*, 644 F.2d at 905. As we have previously pointed out, this shift does not impose an overall burden upon the company to prove itself innocent of violating the statute. Rather, the company must come forward with evidence to the point where no longer does a preponderance of the evidence establish a violation. *NLRB v. Amber Delivery Service, Inc., supra*, slip op. at 22. In this instance, the company met that burden. The simple facts are that Wilson missed sixteen out of thirty-six classes. He kept money paid for attendance. The company believed he missed at least ten. It believed he kept the money knowing it was for classes he had missed. Most of the absences were unreported and unexcused. The company had a strict policy of discharge for dishonesty. And, no other employee had anywhere near so poor a record as Wilson's.

The ALJ reached a different conclusion in part because he did not follow the *Eastern Smelting* analysis and in part because he focused on the wrong question. He defined the "crux" of the matter as whether Wilson "knowing[ly] accepted and retained" payments for his missed classes. The ALJ said no. He found that the inclusion of school pay in a trainee's paycheck was never specifically identified and that, because of confusion in the company's accounting practices, it was not easily detected. In addition, he concluded that Wilson was unaware of the actual purpose of the cash advance received on November 3, crediting Wilson's explanation that he had understood the cash advance to involve omitted "premium payments." Finally, he noted the absence of any formal mechanism for the reporting of class absences by trainees. His conclusion was that "while Wilson did accept as part of his pay, money for classes not attended, it was not an intentional attempt by him to steal from the Respondent." It followed, the ALJ indicated, that "given all the circumstances set out above, Respondent's overreaction to the matter, resulting in Wilson's termination, was motivated by antiunion considerations."

While we recognize the strong deference due an ALJ on matters of credibility, *see, e.*

*g., NLRB v. Pittsburgh S.S. Co.*, 337 U.S. 656, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949), in this instance the record calls his finding into question. *Cf. NLRB v. Payless Cashway Lumber Store*, 508 F.2d 24, 27–28 (8th Cir. 1974) (rejecting credibility determinations of ALJ and Board). The record indicates that Wilson knew generally that he was being compensated for class attendance. Since he only reported four absences and denied the others, the ALJ's finding that he missed nine or ten implies his knowledge of payment for the others. And, Marbury, the payroll clerk, testified that she specifically explained to Wilson how he would be paid for two of the missed classes (although he denied that he understood this).

■ We need not, however, disturb the ALJ's specific factual findings; even if he were correct in concluding that Wilson's receipt of the overpayments was in fact inadvertent, the issue is not Wilson's state of mind but rather that of the company. The "crux" of the matter is whether the company *believed* that he acted dishonestly and whether any such belief was sufficient to cause Wilson's discharge. *See, e. g., NLRB v. South Shore Hosp.*, 571 F.2d 677, 684 (1st Cir. 1978) ("the question is the motive for the discharge, not the actual circumstances"); *NLRB v. Prince Macaroni Manuf. Co.*, 329 F.2d 803, 809 (1st Cir. 1964); *Raytheon Co. v. NLRB*, 326 F.2d 471, 475 (1st Cir. 1964). Upon review of the record, we conclude that any finding that the company did *not* believe, on February 6, 1979, that Wilson acted dishonestly would be unsupported by substantial evidence. Several factors deserve emphasis. First, although the ALJ credited Wilson's testimony that he had been unaware of the reason for the cash advance, the understanding of Donovan, Blinn and Gehrke on this issue at the time of discharge derived solely, so far as the record indicates, from Chaney's comment to Blinn that "there was no way [Wilson] could have received the money without knowing what it was for." There was no evidence to suggest that this statement should have been deemed unworthy of be-

lief. Second, Blinn had ascertained by the end of January that at least one [13] of Wilson's proffered excuses was inaccurate. Finally, although again the ALJ's findings differ with respect to what actually occurred, Kennedy informed the three company officials that Wilson had reported only one of the ten cited absences. Taken together, these factors certainly warranted a belief that Wilson knowingly accepted the overpayments. Given the absence of countervailing evidence, we conclude that Donovan, Blinn and Gehrke did in fact believe that Wilson acted dishonestly.

■ Of course, there is still the matter of Wheeler who also missed classes but kept his job. In light of the company's failure to discipline or even confront Wheeler concerning his two paid absences, the further possibility exists that the company, once convinced of Wilson's dishonesty, decided to impose an unusually severe sanction in retaliation for his union activities. Two factors convince us otherwise. First, termination is an appropriate and common response to employee dishonesty—both as a general matter and (as James Adams testified) as a matter of company policy here. That Wilson was discharged, therefore, is not by itself peculiar. Second, the circumstances surrounding Wheeler's case were sufficiently distinct to render termination inappropriate—and thereby distinguish Wilson's situation. The Company had no evidence, comparable to that of the cash advance and the false explanation in Wilson's case, to suggest that Wheeler knowingly accepted the overpayments. The matter was investigated to the point of determining that he had been paid for only two of the six absences reported by his instructor—nowhere near the ten to sixteen paid absences recorded by Wilson. That the company apparently accorded Wheeler the benefit of the doubt and dropped the matter at that point was not unreasonable; a similar approach was taken with respect to four of Wilson's September absences. Thus, we find the different treatment of Wheeler explainable—not by the fact that he was "less of a thief," as

the ALJ suggested—but by the dearth of evidence that he was a thief at all. For these reasons, we conclude that the company successfully rebutted the Board's *prima facie* showing.

## II.

### *The Refusal to Hire David Stark*

■ The allegation concerning the refusal to hire David Stark can be treated in less detail. We find substantial evidence for the Board's finding of a § 8(a)(3) violation. In response to a newspaper advertisement for millwrights (defined at the hearing as "sophisticated" mechanics), David Stark submitted an application to Wyman-Gordon's maintenance department in October 1978. At the time he was a journeyman millwright with nine years experience at the neighboring Lauhoff Grain Company. Stark had become actively involved with the local industrial workers union during his years at Lauhoff, having previously held the posts of shop steward and executive board member and serving, at the time of his application, as vice-president. The department's hiring process during this period typically involved several stages: (1) a screening interview by an administrative assistant, who prepared a "rating and recommendations" form describing pertinent background data and the interviewer's "gut" evaluation; (2) a review of the materials by Gehrke, the general supervisor, who weeded out those applicants in whom he lacked interest; (3) an additional interview; and (4) a joint decision by Gehrke and Donovan. Stark was given a preliminary interview by Judith Peevler on October 27. Several weeks later he received a standard rejection letter—notwithstanding that an individual with his qualifications, as Gehrke subsequently testified, was "exactly what we [were] looking for."

That the company was aware of Stark's union participation is clear. Over Peevler's denial, the ALJ credited Stark's testimony that during his interview he fully described his union activities at Lauhoff in response

---

**13.** And possibly more. *See* notes 5 & 8 *supra*.

to her questioning on this subject. This credibility determination, which as noted below was buttressed by other evidence, was well within the "bounds of reason" and thus is controlling. *NLRB v. Savin Business Machines Corp.*, 649 F.2d 89 at 92–93 (1st Cir. 1981). In any event, Donovan himself, by admitting that he knew during this period that the Lauhoff millwrights were organized, acknowledged an awareness—if not of Stark's union leadership—then at least of his union membership. This was sufficient to warrant further inquiry.

Against this backdrop, the company's concessions that Stark was amply qualified for the position, and that applications from comparably experienced individuals were "seldom" received, might alone have satisfied the Board's burden. But the General Counsel introduced, and the ALJ apparently credited, additional evidence of discriminatory motivation. Peevler, according to Stark, also remarked during the interview that the company was a "nonunion shop" and inquired how he felt about working under such conditions. Six current maintenance department employees, who were hired during 1977 and 1978 by Gehrke's predecessor, described similar comments being voiced to them at that time by any of five different interviewers. These accounts were in turn corroborated by Wilson, who worked in the personnel office from August 1976 through the fall of 1977. He stated that interviewers had been instructed to ascertain an applicant's union involvement, determine his attitude toward unions and, in closing the interview, to gauge his reaction to the statement: "We here at Wyman-Gordon choose to operate without the benefit of a union." Significantly, Peevler also worked in personnel during this period and, according to Wilson, consistently engaged in this course of questioning. Finally, in her written evaluation of Stark, Peevler wrote that he "[s]eems to lean toward believing in 3d party intervention"; on the basis of widespread evidence including Peevler's own admission, the ALJ found that the term "third party intervention" was a common reference to unions.[14]

The company's attempt to counterbalance the weight of this evidence was properly found wanting.[15] At the outset, it argued that Stark had applied solely for a supervisory position and thus was outside the statutory safeguards. It is undisputed that Stark expressed interest in such a post. But that such was not his exclusive concern is also evident: his overture to the company derived from an advertisement for millwright positions; he listed "maintenance supervisor or millwright" on his application as the positions desired; and he testified to this effect. The company advanced two additional arguments by way of preliminaries. First, it contended that the timing of any such discrimination was illogical; the union had just lost an election several months earlier and any new campaign was necessarily months away. Second, it pointed to the significant percentage of prior union adherents, both in the department's workforce as a whole and in the crop of individuals hired between October 1978 and April 1979. But these arguments prove little. Having just prevailed in a close election, the company might well have been anxious to preserve this balance between pro- and anti-union employees; the margin—and outcome—of the second election certainly suggest that such a concern would have been warranted. That the workforce at that time contained numerous union supporters would have amplified this concern.

**14.** Although acknowledging her awareness of this meaning, Peevler explained that she had employed the term as a reference to Stark's retention of an attorney in connection with a worker's compensation claim at Lauhoff.

**15.** In this context also, the ALJ (and the Board on review) failed to apply the *Eastern Smelting* analysis. But in contrast to his treatment of the Wilson charge, the omission here was one more of form than of substance. Once Stark's account of his interview was credited over that of Peevler, the Board's *prima facie* case was easily established; indeed, the company on appeal has focused almost exclusively on issues pertinent to its rebuttal. The ALJ's discussion of these issues corresponds closely enough to that facet of the *Eastern Smelting* analysis to permit our review (and enforcement) of his decision.

And the significance of the subsequent hiring of several former union members is undercut by the ALJ's finding that union sympathies were carefully screened at the interview stage.

With respect to the actual decision on Stark's application, the company made no attempt to justify or explain it but instead asserted that none was made. It speculated that Gehrke overlooked his application because it had mistakenly been attached to that of Ron Parlier, who was interviewed by Peevler on the same day as Stark. In screening applications, Gehrke's practice at that time was not to place individual notations on each, but simply to segregate them into two piles marked "interest" and "no interest." Under the company's theory, Gehrke, after a partial review, placed Parlier's application (and thus Stark's) into the latter pile and returned the entire stack of rejections to personnel for individual processing; the secretary, upon discovering Stark's application in this pile, assumed it had been rejected and acted accordingly. Although not entirely implausible,[16] this theory was not so compelling as to render the ALJ's contrary findings unreasonable— particularly in light of the credited evidence concerning the interviewers' inquiries into union sympathies. For these reasons, we enforce this aspect of the Board's order.

### III.

### *The § 8(a)(1) Allegations*

[7, 8] Finally, the ALJ determined that on thirteen separate occasions the company coercively interrogated or threatened various employees regarding their union involvement in violation of § 8(a)(1) of the Act.[17] All of the challenged statements were voiced between late January 1979, by which time the union's second campaign had formally commenced, and the June election. The inquiry under § 8(a)(1) is an objective one which examines—not whether the employer intended, or the employee perceived, any coercive effect—but whether "the employer's actions would tend to coerce a reasonable employee." R. Gorman, Labor Law 132 (1976), *quoted in Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055 at 1077 (1st Cir. 1981). A finding of coerciveness, "based as it must be on an assessment of the entire factual context . . . , is one in which we typically defer to agency judgment." *NLRB v. Amber Delivery Service, Inc., supra*, at 67; accord, *NLRB v. Otis Hosp.*, 545 F.2d 252, 256 (1st Cir. 1976); *Corriveau & Routhier Cement Block, Inc. v. NLRB*, 410 F.2d 347, 349 (1st Cir. 1969). With one exception, we conclude that the ALJ's findings are supported by substantial evidence.

■ Seven of the challenged statements were similar in content, involving one of the following variations: that if the employees opted for unionization, (1) bargaining would "begin at zero" and work up; (2) they would start with a "blank piece of paper" with "no pay and no benefits"; or (3) all present benefits would be negotiable and they would stand to lose everything. Whether or nor such comments can reasonably be viewed as veiled threats of economic reprisal and withdrawal of existing benefits depends on the entire factual context. The Board itself has so recognized in weighing the analogous statement that bargaining would "begin from scratch." *Compare Wagner Indus. Prods. Co.*, 170 N.L.R.B. 1413 (1968) (comment suggests only that

16. At the same time, Parlier's application materials indicate that he received a second interview on October 30, three days after he and Stark were screened by Peevler. Although never satisfactorily explained at the hearing, this fact would appear to undercut the supposition that Gehrke rejected him at the preliminary stage.

17. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. . . ." 29 U.S.C. § 158(a)(1) (1970). Section 7 provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." *Id.* § 157.

unionization would not automatically result in increased benefits), *with Astronautics Corp. of America*, 164 N.L.R.B. 623 (1967) (comment threatens loss of existing benefits). We see no basis in the record for upsetting the ALJ's findings that these remarks carried a coercive overtone. *See, e. g., NLRB v. Saunders Leasing Systems, Inc.*, 497 F.2d 453, 456–58 (8th Cir. 1974); *NLRB v. Aerovox Corp.*, 435 F.2d 1208, 1211–12 (4th Cir. 1970); *Surprenant Manuf. Co. v. NLRB*, 341 F.2d 756, 761 (6th Cir. 1965).

 Three of the remaining incidents constituted clearcut violations. In the first, an employee was heatedly informed by his supervisors that the workers were "liable to lose pay and benefits" with the advent of a union; that the bargaining process would take "a long time," for the length of which they would receive neither their annual raise nor quarterly cost-of-living allowance; that during a strike the employees could be replaced and not recalled for ten years; and that a strike could be called or dues raised without their "having anything to say about it." Second, two employees together approached their respective supervisors and inquired whether they would be able to change the dates of their vacations if the upcoming election were held during that time. One of the supervisors responded: "Tell us how you are going to vote and we'll let you know about your vacations." The third incident in this group was Peevler's interrogation of Stark during his interview.[18]

 Two other statements constituted closer, but nonetheless cognizable, § 8(a)(1) violations. First, in response to an employee's complaint about the lack of flexibility in scheduling vacations, his supervisor remarked that the timing of vacations was company policy about which the union "won't be able to do anything." Although this was a fleeting reference, "even a single oblique remark can be considered unduly coercive in appropriate circumstances." *NLRB v. Amber Delivery Service, Inc., su-*

*pra*, slip op. at 19. In the circumstances, we believe the ALJ was warranted in discerning a coercive implication that the choice of union representation would be futile. *See, e. g., NLRB v. Kaiser Agric. Chemicals*, 473 F.2d 374, 380 (5th Cir. 1973). The ALJ also found unlawful a single question posed to an employee by his supervisor as to his desire for union representation. The inquiry occurred during, but was unrelated to, a discussion in the supervisor's office regarding the employee's alleged "attitude problem." We find no error.

 We do differ, however, with the ALJ's finding of a violation with respect to the final § 8(a)(1) allegation. The full account of this incident consists of the following testimony by the alleged victim: "Ken Lucas asked me how the union was coming along. I told him fine, I was working on it. He stated that I guess this is a free country and turned around and walked away." We think the ALJ should have walked away from this also.

## IV.

### *The Remedial Order*

 The company's remaining contention is that the final catch-all paragraph of the Board's order—requiring it to cease and desist from "[i]n any other manner interfering with, restraining or coercing employees in the exercise of their rights under Section 7 of the Act"—is overly broad. Such a broad-based prohibition on future violations can be appropriate in the face of "persistent attempts to interfere with legislatively protected rights by varying methods." *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 (1st Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *accord, e.g., Morgan Precision Parts v. NLRB*, 444 F.2d 1210, 1215 (5th Cir. 1971). We agree, however, that it is unwarranted on the present record. Although the company's unlawful practices were not isolated or fleeting occurrences, neither were they "particularly virulent" in nature.

---

18. That the statutory protections extend to prospective employees is clear. *E. g., NLRB v. Speed Queen*, 469 F.2d 189, 191–92 (8th Cir. 1972); *Time-O-Matic, Inc. v. NLRB*, 264 F.2d 96, 99 (7th Cir. 1959); *Lipman, Ruttenberg & Goldstein, d/b/a Ascot Nursing Centre*, 216 N.L.R.B. 680, 681 (1975).

2 T. Kheel, Labor Law § 7.04[2], at 7–144 to –145 (1980). And, the claim upon which the General Counsel has concentrated his attention—Wilson's dismissal—has proven unsubstantiated. In addition, the company's various antiunion practices were directed principally at preventing the union from gaining a foothold. Now that the union has prevailed in this respect, it is reasonable to expect a diminution—if not of the company's antiunion animus—then at least of its unlawful actions. Consequently, while we enforce the more specific provisions of the cease and desist order, we conclude that the catch-all paragraph should be stricken. *See generally NLRB v. Savin Business Machines Corp., supra,* 649 F.2d at 93; *NLRB v. Beth Israel Hosp.,* 554 F.2d 477, 483 (1st Cir. 1977), *aff'd,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978); *NLRB v. Prince Macaroni Manuf. Co.,* 329 F.2d at 812.

*Enforcement granted in part.*