# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 19, 2020          Decided June 12, 2020

No. 19-1065

INDEPENDENT UNION OF PENSION EMPLOYEES FOR
DEMOCRACY AND JUSTICE,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of an Order of the Federal Labor
Relations Authority

*Eden Brown Gaines* argued the cause and filed the briefs
for petitioner.

*Rebecca J. Osborne*, Deputy Solicitor, Federal Labor
Relations Authority, argued the cause and filed the brief for
respondent. *Noah B. Peters*, Attorney, entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and
GINSBURG, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Independent Union of Pension Employees for Democracy and Justice ("Union") petitions for review of a Federal Labor Relations Authority ("Authority") order finding that it committed unfair labor practices by attempting to dismantle the pool of arbitrators selected by a predecessor union and thereby impeding access to the grievance process. Because the Union has not demonstrated that the Authority acted arbitrarily, capriciously, or contrary to law, the court denies the petition for review.

## I.

The Union of Pension Employees ("UPE") was the exclusive representative of bargaining unit employees of the Pension Benefit Guaranty Corporation ("PBGC") between March 2009 and November 2011. During that period, UPE and PBGC negotiated a collective bargaining agreement ("CBA"), which went into effect on May 3, 2011. Article 2 of the CBA governed arbitration procedures, with Section 3(B) describing how arbitrators would be selected:

B. Arbitration Procedure:

1. Selection of the Pool – Within thirty (30) days of implementation of this Agreement, the Parties will exchange lists of the names of ten (10) arbitrators they deem acceptable to serve as arbitrator for disputes under this Agreement. Up to five arbitrators common on both Parties' lists will be informed of their selection to serve as a member of a rotating panel. If there are not five (5) names common to both lists, the Parties will repeat the process until five (5) common names have been identified. If a vacancy is created, the Parties will repeat the selection

process to fill the vacancy. Any fees or costs in establishing the pool of arbitrators will be borne by the Employer.

2. Invocation – A Party has seven (7) days, from receipt of the Agency's final grievance decision, to invoke arbitration. Failure to invoke arbitration within this period waives a Party's right to adjudicate the matter in arbitration.

3. Selection of the Arbitrator – Once the pool has been identified, as arbitrations are invoked, arbitrators will be selected alphabetically by their last name.

The UPE was not, however, the only union interested in representing PBGC employees. As early as July 2010, the Union had requested that an election be held so that employees could vote on which union they preferred. A week after the CBA went into effect, the Authority conducted the representation election. The Union won. After denying the UPE's application for review, the Authority certified the Union on November 16, 2011, as the exclusive representative of PBGC bargaining unit employees, thereby displacing the UPE.

While the Authority was considering the UPE's application for review of the election, the UPE and the PBGC selected the five arbitrators who would serve in the pool. On September 20, 2011, they signed a Memorandum of Agreement ("MOA") naming the five arbitrators: James Conway, Charles Feigenbaum, Allen Foster, Joshua Javits, and Seymour Strongin.

Over a year later, in December 2012, the Union invoked arbitration over four pending grievances. The following month, on January 18, 2013, Conway and Feigenbaum were designated as the arbitrators for the first two grievances (they were the first two arbitrators alphabetically). That same day, the president of the Union sent an email to both Conway and Feigenbaum noting that they had been selected by the prior union and requesting that the two arbitrators share any conversations they had with the UPE or the PBGC about their selection and participate in an interview with the Union. Conway and Feigenbaum both responded that they had not communicated with the prior union and declined the Union's interview request. The Union replied with a letter dated January 29 staking out its position:

> As explained in our January 18 letter, as a new union at PBGC and as a new party, the Independent Union of Pension Employees for Democracy and Justice ("IUPEDJ") believes that it should have a role in the selection of arbitrators. <u>In fairness and as a matter of professionalism, we respectfully suggest that you voluntarily withdraw your participation in the arbitrator pool.</u>

Feigenbaum sent an email the following week resigning from the arbitration pool, explaining that he did "not wish to preside over cases where the non-selecting party does not wish me to be the decision maker."

Conway, however, refused the Union's initial request to step down. On February 21, the Union sent Conway an email with the subject line "Request That You Reconsider Resignation in Light of Ethics Violations." In the email, the Union alleged that Conway's "refusal to resign violates the very first rule at the top of" the applicable Code of Professional

Responsibility, namely, that an arbitrator be selected by mutual agreement of the parties. Because the Union had not participated in or agreed to Conway's selection, it "demand[ed]" his resignation due to his "outright violation" of the ethics rule and his "unprofessional" behavior. Conway did not resign; to the contrary, he subsequently issued an award against the Union in the case he had been assigned to arbitrate. The Authority upheld that award over the Union's objections, concluding that the Union was bound by the arbitration provisions of the CBA and that Conway's appointment to the arbitrator pool was valid. *See Indep. Union of Pension Emps. for Democracy & Justice*, 68 F.L.R.A. 999, 1003–08 (2015) ("*IUPEDJ 2015*"), *recons. denied*, 69 F.L.R.A. 158 (2016). The Union did not petition this court for review. Following a dispute over Conway's fees, and Conway filing a lawsuit in D.C. Superior Court, the Union and Conway entered into a settlement agreement in October 2015 pursuant to which the Union paid his fees and Conway resigned from the pool of arbitrators.

Problems arose with the other arbitrators, too. On February 14, the Union emailed Foster, the next arbitrator on the list, to tell him that the Union had not participated in his selection and thus it believed he should not hear the assigned grievance. Strongin served as an arbitrator but reported difficulty collecting his arbitration fees from the Union and ultimately resigned from the arbitration pool in December 2013. Javits was selected to arbitrate a grievance in May 2014, but the Union told Javits that it had not participated in his selection. Seven months later, the Union sent Javits an email accusing him of violating the "paramount rule" of the ethics code that the arbitrator be selected by mutual agreement of the parties and restated its position that the Union had not mutually agreed to his selection.

The PBGC filed its first unfair labor practice charge in February 2013 based on the Union's communications with arbitrators Conway and Feigenbaum. It filed a second unfair labor practice charge in January 2015 after arbitrators reported difficulty collecting fees from the Union and the Union accused Javits of ethics violations. The Authority's general counsel later issued a complaint on each charge, alleging that the Union violated 5 U.S.C. § 7116(b)(1) and (5), which make it an unfair labor practice for a union "to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter" and "to refuse to consult or negotiate in good faith with an agency as required by this chapter," respectively.

The administrative law judge ("ALJ") consolidated the two complaints and, over the Union's opposition, recommended granting the general counsel's motion for summary judgment. *See Indep. Union of Pension Emps. for Democracy & Justice*, 70 F.L.R.A. No. 164, OALJ 17-10, 2017 WL 955570 (Feb. 28, 2017) ("ALJ Decision"). The ALJ relied on *IUPEDJ 2015*, in which the Authority had determined that "the grievance and arbitration procedures under the CBA negotiated by the previous exclusive representative bind the Union." *Id.* at \*19 (quoting *IUPEDJ 2015*, 68 F.L.R.A. at 1004). The ALJ therefore ruled that the Union committed an unfair labor practice by "denying the binding nature of Article 2, Section 3(B)(3) of the CBA and the arbitration panel properly established by the MOA, and by actively attempting to dismantle the arbitration panel set forth in the MOA through active solicitation of resignations from the duly appointed Arbitrators Conway and Feigenbaum." *Id.* at \*22. Further, the ALJ ruled that the Union committed an unfair labor practice when it refused to accept Javits as an arbitrator and made unfounded ethics code accusations against him. *Id.* at \*24. But the ALJ ruled that failing to comply with Conway's scheduling

orders and refusing to pay arbitrators were not separate unfair labor practices. *Id.* at \*22, \*24.

The Authority largely adopted the ALJ's recommended decision and order except for, as relevant to this petition, the remedy. *See Indep. Union of Pension Emps. for Democracy & Justice*, 70 F.L.R.A. 820, 820 (2018) ("Order"). The Authority found that the Union committed unfair labor practices by denying bargaining unit employees access to the CBA's grievance procedures, thereby violating 5 U.S.C. § 7116(b)(1) and (5). *Id.* at 825. It rejected the Union's defense that its statements were protected by 5 U.S.C. § 7116(e). *Id.* at 826. With the goal of restoring the *status quo ante*, the Authority considered post-charge events and crafted a non-traditional remedy, ordering the Union to offer Conway and Feigenbaum an opportunity to rejoin the arbitration panel. *Id.* at 826–28. The Authority denied the Union's motion for reconsideration on the ground that it did not present any extraordinary circumstances warranting reconsideration but instead contained arguments already considered and rejected, mischaracterized the underlying decision, and relied on *dicta* from the Authority's initial decision to support one of its arguments. *Indep. Union of Pension Emps. for Democracy & Justice*, 71 F.L.R.A. 60, 60 (2019).

## II.

The Union petitions for review, 5 U.S.C. § 7123(a), and the court reviews the Authority's orders in accordance with the standard set forth in the Administrative Procedure Act, *see id.* § 7123(c), so the court will uphold the Authority's decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). *See also Nat'l Treasury Emps. Union v. FLRA*, 754 F.3d 1031, 1041 (D.C. Cir. 2014). The Authority's findings of fact are

"conclusive" so long as they are "supported by substantial evidence on the record considered as a whole." *Id.* § 7123(c). Absent extraordinary circumstances, the court cannot consider any "objection that has not been urged before the Authority." *Id.* The "Authority is entitled to considerable deference when it exercises its special function of applying the general provisions of the [Civil Service Reform] Act to the complexities of federal labor relations." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983) (internal quotation omitted). Thus, the role for judicial review is "narrow." *Am. Fed'n of Gov't Emps., Local 2343 v. FLRA*, 144 F.3d 85, 88 (D.C. Cir. 1998) (quoting *Overseas Educ. Ass'n, Inc. v. FLRA*, 858 F.2d 769, 771 (D.C. Cir. 1988)).

The Union raises five principal issues in its petition, all of which the court finds unavailing.

## A.

First, the Authority's conclusion that the Union committed unfair labor practices was not arbitrary and capricious. To the contrary, the Authority followed its own precedent — including *IUPEDJ 2015*, in which it rejected the Union's objections to the arbitration procedures — when it determined that the Union's outreach to the two arbitrators amounted to unfair labor practices.

The Civil Service Reform Act makes it an unfair labor practice for a labor organization "(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter" or "(5) to refuse to consult or negotiate in good faith with an agency as required by this chapter." 5 U.S.C. § 7116(b). The Authority has reasoned that "the purposes and policies of the Statute are best effectuated by a requirement that the existing personnel policies and practices

and matters affecting working conditions—including negotiated grievance and arbitration procedures—must continue as established upon the expiration of a negotiated agreement, absent an express agreement by the parties to the contrary or unless modified in a manner consistent with the Statute." *Dep't of the Air Force 35th Combat Support Grp.*, 4 F.L.R.A. 22, 23 (1980). And "where a party repudiates a memorandum of understanding or an agreement in its entirety, such conduct is violative of the Statute." *Am. Fed'n of Gov't Emps.*, 21 F.L.R.A. 986, 988 (1986). More recently, in its *IUPEDJ 2015* order, the Authority explained:

> It is well established that when a negotiated agreement expires, personnel policies, practices, and matters affecting working conditions continue to the maximum extent possible absent either an express agreement to the contrary or the modification of those conditions of employment in a manner consistent with the Statute. These continuing policies, practices, and matters encompass negotiated grievance and arbitration procedures. And negotiated grievance and arbitration procedures include the selection of an arbitrator.
>
> Furthermore, such provisions survive and remain in full effect not only following contract expiration, but even following the decertification of one exclusive representative and the installation of a new one. . . . Consequently, considering the pragmatic, tangible benefits that inure to the parties' collective-bargaining relationship and the federal workforce flowing from this precedent, we conclude that the grievance and arbitration procedures under the CBA negotiated by the previous exclusive representative bind the Union.

*IUPEDJ 2015*, 68 F.L.R.A. at 1004 (footnotes omitted).

The Union acknowledges that a collective bargaining agreement negotiated by a predecessor union remains effective until a new one is implemented. Therefore, it maintains more narrowly that it was not required to accede to the list of arbitrators selected by the UPE and the PBGC because it was not a party to the MOA. According to the Union, the "lack of mutuality in the selection of the arbitrators" rendered the list invalid, especially because the arbitrators were selected after the Union had won the representation election (but before it was certified). Pet'r Br. at 13, 15.

The Union's position that it was not required to accept the agreed-upon pool of arbitrators is foreclosed by the Authority's precedent. The Union does not cite a single case to support its position, instead relying only on the text of the CBA, which states that the *parties* select the arbitrators. Here, the parties selected the five arbitrators, although they did so before the Union became the exclusive bargaining representative and hence a party to the agreement. The Authority's precedent makes clear, however, that the Union was bound by the prior union's selection of the arbitrators when it became a party to the CBA. *See IUPEDJ 2015*, 68 F.L.R.A. at 1004. Thus, the Authority reasonably found that the Union's refusal to abide by the negotiated arbitration procedures and its attempts to dismantle the arbitrator pool interfered with employees' access to grievance procedures. *See Am. Fed'n of Gov't Emps., Local 2782*, 21 F.L.R.A. 339, 350–51 (1986).

Further, contrary to the Union's assertion, the Authority did not fail to explain "how the Union's actions constituted a refusal to consult or negotiate in good faith with an agency under § 7116(b)(5)." Pet'r Br. at 13–14. The Authority reasoned that the Union refused to negotiate in good faith because it "unilaterally ceased to give effect to the CBA."

Order, 70 F.L.R.A. at 825. As support for this interpretation of the statute, the Authority cited a prior decision in which it had found that when an agency unilaterally ceases to give effect to an agreement between the agency and the prior exclusive representative, it violates § 7116(a)(5), the parallel provision in the Act that applies to agencies, and thus when a union does so, it violates § 7116(b)(5). *Id.* at 842 (citing *Dep't of Health & Human Servs. Soc. Sec. Admin.*, 44 F.L.R.A. 870, 881 (1992)). This explanation was adequate.

The Union also argues that any challenge to its attempts to exclude arbitrators from the pool "would only be properly pursued as a grievance concerning the proper interpretation of the language of the CBA, rather than a ULP." Pet'r Br. at 15–16. But the Union provides no support for this argument other than pointing to the existence of grievance procedures. In view of Authority precedent on what constitutes an unfair labor practice and the public interest in ensuring access to grievance procedures, the Authority's orders were not improper.

In short, the Union has not provided any basis for the court to conclude that the Authority was arbitrary and capricious in finding that the Union committed unfair labor practices by refusing to use the arbitrators selected by the predecessor union.

**B.**

Second, the Authority did not act contrary to law when it determined that the Union acted outside of the statutory protection for the expression of personal views.

The Civil Service Reform Act protects certain types of statements:

The expression of any personal view, argument, opinion or the making of any statement which—

> (1) publicizes the fact of a representational election and encourages employees to exercise their right to vote in such election,
> (2) corrects the record with respect to any false or misleading statement made by any person, or
> (3) informs employees of the Government's policy relating to labor-management relations and representation,

shall not, if the expression contains no threat of reprisal or force or promise of benefit or was not made under coercive conditions, (A) constitute an unfair labor practice under any provision of this chapter, or (B) constitute grounds for the setting aside of any election conducted under any provisions of this chapter.

5 U.S.C. § 7116(e).

The Union contends that its communications "were neither coercive nor threatening in nature," and that the Authority committed clear error by characterizing them as such. Pet'r Br. at 16–17. On appeal, the Authority responds that the statute does not protect statements made by a union in its role as the exclusive representative, that the statements contained threats of reprisal, and that the statements were made under coercive conditions.

The Authority's third argument, which both the Authority and ALJ relied upon in their respective proceedings, is sufficient to deny the petition, and therefore the court need neither analyze the Authority's other theories nor construe the precise contours of the statutory exemption. The Authority

applies an objective test to determine whether coercive conditions existed: it must assess "the entire factual context [to] examine not whether the [union] intended, or the [person] perceived, any coercive effect, but whether the [union's] actions would tend to coerce a reasonable [person]." *Army & Air Force Exch. Serv. (AAFES), Ft. Carson*, 9 F.L.R.A. 620, 626–27 (1982); *see also Wyman-Gordon Co. v. NLRB*, 654 F.2d 134, 145 (1st Cir. 1981). Here, the ALJ found that the Union's "repeated refusals to be bound by the MOA, and [its] attempts to dismantle a panel properly established pursuant to the inherited CBA by asking, encouraging and even demanding arbitrators to resign under threat of ethics allegations" were made under coercive conditions. ALJ Decision, 2017 WL 955570, at *26. The Authority affirmed that finding. Order, 70 F.L.R.A. at 826. Given the ALJ's prior findings that "the ethical code cited by the Union d[id] not support [its] claim," and that the Union "manufactur[ed] spurious ethical complaints to bully and intimidate," ALJ Decision, 2017 WL 955570, at *21, *26, the finding of coercive conditions was supported by substantial evidence on the record considered as a whole and thus the Authority's determinations were not, despite the Union's argument that the court should second-guess them, contrary to law.

## C.

Third, the Union has not demonstrated that its First Amendment rights were violated, seeing as it failed to identify a public concern implicated by its speech.

In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court held that if a government employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [a court] to scrutinize the reasons for" the employee's termination. *Id.* at 146. This court has

explained that *Connick* means that "only if a court finds that the public employee's speech meets this threshold requirement should the court go on to balance the employee's interests in free expression against the government's interest in curtailing the expression." *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 300 (D.C. Cir. 1987). The Authority has applied the *Connick* standard to the speech of public employee unions. *See IUPEDJ 2015*, 68 F.L.R.A. at 1011–12 (citing *Booth v. Pasco Cty.*, 757 F.3d 1198, 1214 (11th Cir. 2014)).

The ALJ found the Union's First Amendment argument meritless because it "has not even cited a public concern involved in its resignation requests, and none is apparent." ALJ Decision, 2017 WL 955570, at *27. Likewise, the Authority "reject[ed] the Union's First Amendment claims . . . as the Union does not argue that its speech was a matter of public concern." Order, 70 F.L.R.A. at 826 n.70.

Absent extraordinary circumstances, this court does not consider a party's objections not raised before the Authority. *See* 5 U.S.C. § 7123(c); *EEOC v. FLRA*, 476 U.S. 19, 23 (1986). In briefing before the ALJ and the Authority, the Union repeatedly characterized its statements as beliefs, opinions, or related to the grievance process, but never identified a public concern, even after the ALJ faulted the Union for failing to do so. Even assuming that the Union were able to overcome the barrier imposed by § 7123(c), it has done little to bolster its public concern argument on appeal, except to posit that "Union activity or union related speech is generally considered to be a matter of public concern" and that its statements about the grievance process are protected speech. *See* Pet'r Br. at 18–19. For support, the Union relies primarily on *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), in which the Supreme Court observed that "union speech in the

handling of grievances *may* be of substantial public importance and *may* be directed at the public square." *Id.* at 2476 (quotation omitted and emphasis added). But unlike in *Janus*, where the union had sought to compel the state to appropriate public funds for increased wages, the Union here has not connected its speech to matters of public concern except to gesture broadly at the importance of the grievance process. Consequently, because the Union (1) failed before the Authority to identify a public concern implicated by its statements, (2) does not argue that any extraordinary circumstances excuse its failure, and (3) cannot articulate a public concern on appeal, its First Amendment argument is meritless.

**D.**

Fourth, the Authority's nontraditional remedy did not exceed its statutory authority because it was an appropriate exercise of its power to carry out the purposes of the Civil Service Reform Act by restoring the *status quo ante*.

The Act "exude[s] indications of a broad congressional delegation of discretion to the FLRA to fashion appropriate remedies for an unfair labor practice." *Nat'l Treasury Emps. Union v. FLRA*, 910 F.2d 964, 967 (D.C. Cir. 1990) (*en banc*) ("*NTEU*"). Upon finding that an unfair labor practice occurred, Congress vested the Authority with power to issue orders to the agency or labor organization

> (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;
> (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of

16

the Authority and requiring that the agreement, as amended, be given retroactive effect;

(C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

(D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.

5 U.S.C. § 7118(a)(7). "Subparagraph (D) underscores Congress' intent, that the FLRA be granted discretion to choose what it deems the appropriate responses to an unfair labor practice." *NTEU*, 910 F.2d at 967. In turn, the Authority has explained that it "believe[s] that remedies for unfair labor practices under the Statute should, like those under the NLRA, be 'designed to recreate the conditions and relationships that would have been had there been no unfair labor practice.'" *U.S. Dep't of Justice Bureau of Prisons, Safford*, 35 F.L.R.A. 431, 444–45 (1990) (quoting *Local 60, United Bhd. of Carpenters & Joiners v. NLRB*, 365 U.S. 651, 657 (1961) (Harlan, J., concurring)). To that end, "assuming that there exist no legal or public policy objections to a proposed, nontraditional remedy, the questions are whether the remedy is reasonably necessary and would be effective to recreate the conditions and relationships with which the unfair labor practice interfered, as well as to effectuate the policies of the Statute, including the deterrence of future violative conduct." *F.E. Warren Air Force Base Cheyenne*, 52 F.L.R.A. 149, 161 (1996) (internal quotation omitted).

To begin, the Union's first argument — that it should not be ordered to invite Feigenbaum back to the panel because it did not commit an unfair labor practice with respect to him —

is vitiated by the court's denial of its petition for review of the underlying unfair labor practice finding.

The Union's legal and public policy objections to the remedy fare no better. First, the Union argues that because Conway resigned after charges were filed, the nontraditional remedy of offering reinstatement violated the six-month limitations period imposed by 5 U.S.C. § 7118(a)(4). But that provision limits when a complaint may be filed, not the baseline for restoring the *status quo* prior to the unfair labor practices. Second, the Union contends that the remedy interferes with it and Conway's "rights to freely contract" because the remedy requires them to "repudiate a legally binding, voluntary settlement agreement." Pet'r Br. at 20–21. Neither the Authority nor the Agency, however, were parties to the fee dispute settlement agreement. And it would unduly frustrate the purposes of the Act if two parties were able to use a private agreement to circumvent the Authority's statutory power to remedy unfair labor practices and vindicate the public interest. *Cf. Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 806 F.2d 269, 272 (D.C. Cir. 1986). Therefore, the Authority's order requiring the Union to invite Conway back into the arbitration pool does not present any legal or public policy objections but rather effectuates the policies embodied in the Act by attempting to restore the parties to the *status quo ante*.

## E.

Fifth, and finally, the court denies the Union's application for leave to adduce additional evidence because the Union has not established that the evidence is material or that there were reasonable grounds for the Union's failure to adduce it earlier.

"If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the Authority, or its designee, the court may order the additional evidence to be taken before the Authority, or its designee, and to be made a part of the record." 5 U.S.C. § 7123(c).

The Union contends that the Authority should be required to consider the fact that Conway moved to Minnesota from the District of Columbia because neither the prior union nor the Agency intended to incur travel costs when they selected him as an arbitrator. With respect to materiality, although the Union attaches an email showing that proximity to Washington was a factor in *selecting* the arbitrators, it has not established that Conway's move would have affected his continued inclusion in the pool. Thus, the Union has not met its burden to show that this information is material to the remedy, which sought to restore the *status quo ante*. Further, the Union has barely argued that there was a reasonable ground for its failure to present this evidence earlier, and none is apparent. The Union received an invoice dated July 2, 2018, from Conway's Minnesota address and admits that it learned of his move at an unspecified date in "late 2018." But the Union waited until "early 2019" to research Conway's move and did not seek to supplement the record until *after* the Authority denied its motion for reconsideration. This lack of haste belies the Union's contention that its failure to adduce this evidence earlier was somehow justified.

Accordingly, because the Union has not demonstrated that the Authority's order was arbitrary, capricious, or otherwise contrary to law, the court denies its petition for review and its application for leave to adduce additional evidence.